UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

LEE REBALKO and
RUTH EVANS REBALKO,

$\qquad$ *Plaintiffs*,

vs.

THE CITY OF CORAL SPRINGS,
a domestic municipal corporation,
ROBERT COUPE, individually, and
in his official capacity as a police officer
of the City of Coral Springs, JESSE PEREZ,
individually, and in his official capacity as a
police officer of the City of Coral Springs,
FLORIDA LEAGUE OF CITIES, INC.,
a domestic corporation and JOHN DOES I-X,

$\qquad$ *Defendants*.

_____/

## COMPLAINT

Plaintiffs, Lee Rebalko and Ruth Evans Rebalko (collectively the "Plaintiffs" or "Mr. Rebalko" individually or "Mrs. Rebalko" individually) by and through undersigned counsel, sue Defendants, the City of Coral Springs (the "City"), Robert Coupe ("Coupe"), Jesse Perez ("Perez"), Florida League of Cities, Inc. (the "FLC"), and John Does I-X, as follows:

1.      At all material times, Plaintiffs have been and are citizens of the United States of America and residents of Broward County, Florida.  At all material times, Mr. Rebalko has been (and is) disabled as defined by the Americans With Disabilities Act ("ADA") and the

Rehabilitation Act and Mrs. Rebalko has been (and is) a known associated person as defined by the ADA and the Rehabilitation Act.  Plaintiffs are both *sui juris*.

2.      At all material times, the City has been (and is) a domestic municipal corporation organized under the laws of the State of Florida who has acted as a local government providing public services including its own municipal police department (the City of Coral Springs Police Department, "CCCSPD") with authority to act and provide local services, including police protection and law enforcement services within its municipal boundaries.  At all material times, the City has been a "person" under Title 42, United States Code, Section 1983 and has been a "public entity" under the ADA, Title 42, United States Code, Section 12131.  At all material times, the City, has employed persons, who, while acting within the course and scope of their employment and while acting under color of law and / or while individually acting, have participated in or otherwise influenced the deprivation of Plaintiffs' civil rights as guaranteed under the Constitution of the United States of America and Amendments thereto, Plaintiffs' civil rights and protections as afforded under federal law and Plaintiffs' common law and/or statutory protections under the laws of the State of Florida.

3.      At all material times, Coupe and Perez were acting as municipal police officers of the City.  Pursuant to Title 42, United States Code, Section 1983, Coupe and Perez were, at all material times, a "person" acting in the capacity of an agent, servant, and / or employee of the City under the City's direction and / or control.  At all material times, Coupe and Perez participated in or otherwise influenced the deprivation of Plaintiffs' federal and state protected rights while acting within the course and scope of their agency, service, or employment for City and / or while acting individually, but under color of law, as defined by Title 42, United States Code, Section 1983.  At all material times, Coupe and Perez are known to be domiciled in Florida.  Although their exact

place of residence is unknown to Plaintiffs, both Coupe and Perez have provided as their residence the Broward address of the CCSPD.

4.    John Does I—X are joined in this action as unknown persons and / or supervisors of Coupe and Perez who participated in the review and approval of these police officers' actions and / or reports, as well as such other wrongful acts (including collusive acts) that are hereinafter alleged.  John Does I-X is also used to designate those City policymaking level personnel who either directly and / or indirectly urged the prosecution of criminal charges against Mr. Rebalko after the Office of the State Attorney ("SAO") declined to prosecute charges against Mr. Rebalko.

5.    At all material times, the FLC was an insurer / claims representative of the City (at the very least).  FLC is a domestic corporation with its principal place of business / headquarters in Tallahassee, Florida, Leon County.  The FLC actively conducts business in Broward County, Florida and had a hand in (perhaps the most direct hand in) the violations of Section 627.4137 of the Florida Statutes, as hereinafter described, all of which occurred in Broward County, Florida.

6.    This action sounds in the Constitution of the United States of America, the laws of the United States of America, and Florida law, relating to incidents that started with the unlawful arrest of Mr. Rebalko, on March, 4, 2015, with related claims accruing through June 30, 2017. Plaintiffs seek monetary recovery (*e.g.*, compensatory damages, punitive damages, attorney's fees, expert expense, costs) as well as injunctive relief under the ADA.  This suit also includes various state claims seeking various forms of cognizable relief and such further relief as the Court deems equitable, just, and / or proper under the circumstances.

7.    Individual claims are also asserted against municipal police officers Coupe and Perez for their unconstitutional and / or unlawful conduct and departures from the law during the course of their pre-arrest, arrest, and post-arrest activities that indirectly and / or directly involved

3

one or more of the Plaintiffs.  Neither municipal officer can claim qualified immunity, as at no material time, although they acted under color of law, could either municipal officer have performed a lawful duty (such as issuing an order or making a criminal arrest) because both officers were acting outside their municipal jurisdictional boundaries and neither municipal officer took any action to gain extra-jurisdictional authority.  Accordingly, their only status at the time was merely that of private citizens who were upon Plaintiffs' shared private property without invitation. Plaintiffs further contend that neither officer can claim qualified immunity as their conduct, as more fully alleged herein, was mired in bad faith, with malicious and discriminatory purposes that demonstrated a willful and wanton disregard of Plaintiffs' human rights, safety, and property. Plaintiffs further contend that the facts set forth below demonstrate that Coupe's attempted orders clearly exceeded his discretionary authority by demanding of Mr. Rebalko that he engage in conduct that would have been both unlawful (*e.g.*, ordering a person to run a red light) and extremely dangerous (akin to ordering a person to jump off the roof of a high-rise building).

8.     More specifically, this action arises, in part, under Title 42, United States Code, Sections 1983 and 1988, based on, for examples, the City's, Coupe's, and / or Perez's deprivation of Mr. Rebalko's federally protected rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.  Plaintiffs also assert the City's Section 1983 liability upon the basis that Mr. Rebalko would not have been deprived of his federally protected rights but for the City's (inadequate) training / education and / or supervisory policies, customs, usages, and / or practices relating to its administrative arms (*e.g.*, CCSPD) and / or personnel (*e.g.*, Coupe and Perez).  Plaintiffs seek further relief under Title 42, United States Code, Sections 1983 and 1988, based on Plaintiffs' information and belief that the City, with full knowledge of the unlawfulness of Mr. Rebalko's arrest, had a municipal policymaking level representative exert pressure (either

directly or indirectly through the approved actions of subordinates) upon the SAO to reverse their decision not to criminally charge Mr. Rebalko.  This action was taken by the City in retaliation to an ongoing dispute involving a private road that is partially owned by Mr. Rebalko and as a malicious act of self-protection to ward off and defend against Mr. Rebalko's impending civil claim stemming from the false arrest.  This policymaking level action resulted in the instigation of a twenty-seven month nonjusticiable prosecution against Mr. Rebalko.  The City's self-serving and malicious advocacy was further misguided through the use of material fact misrepresentations and purposeful distortion of applicable legal principles while persuading the SAO to file charges after the SAO had opted not to file charges against Mr. Rebalko.

9.    This action also arises, in part, out of Defendants' (other than FLC) deprivation of (and / or failure to preserve) Plaintiffs' rights or protections under the ADA, Title 42, United States Code, Section 12101, *et seq*. (namely Sections 12131 – 12134) in conjunction with the Rehabilitation Act, Title 29, United States Code, Section 701, *et seq.* (namely Section 794) based upon their knowing failure to accommodate as well as their demonstrated and verbally expressed contempt for the disabled, notwithstanding that said Defendants' sole governmental existence is for the purpose of furthering the benefit and safety of the public.  Mr. Rebalko claims standing under the ADA as a disabled person and Mrs. Rebalko claims standing under the ADA as a known associated person.

10.    This action also arises, in part, out of Coupe's, and Perez's unconstitutional seizure / false arrest / false imprisonment / battery / infliction of Mr. Rebalko, as well as their malicious and fraudulent post-arrest cover-up scheme (as more fully alleged below) at the expense of committing perjury, sending an innocent person to jail, perverting the criminal justice system and exposing the City to significant civil liability.

5

11.　　This action additionally arises from the City's, Coupe's and Perez's bad faith complicity to maliciously give credence to an otherwise hapless prosecution mired in retaliatory motive and for the pecuniary gain of staving off a potential civil action.

12.　　This action also arises, in part, out of the FLC's and the City's violation of Section 627.4137 of the Florida Statutes, by failing / refusing to comply with the disclosure requirements of this law.

13.　　Pursuant to Title 28, United States Code, Section 1331 and / or Title 28, United States Code, Section 1343, this Court possesses original federal question jurisdiction as to the causes of action arising out of the Constitution or the laws of the United States of America.  As to the aspects of this action that do not arise under the Constitution or laws of the United States of America (*i.e.*, Plaintiffs' state law claims), this Court has pendent jurisdiction over same pursuant to Title 28, United States Code, Section 1367.

14.　　Venue is proper in the Southern District of Florida pursuant to Title 28, United States Code, Section 1391(b), since, for examples:  (a) Several of the Defendants (all of whom are Floridians) are domiciled or maintain their principal place of business in this jurisdiction, (b) a substantial part of the events or omissions giving rise to the subject causes of action occurred in this jurisdiction, and, for what it is worth, (c) Plaintiffs reside in this jurisdiction.

15.　　All conditions precedent to the institution of this action (*e.g.*, Section 768.28(6) of the Florida Statutes) have occurred, been performed, been waived, or were futile.[1]

---

[1] As to the notice letter prescribed by Section 768.28(6) of the Florida Statutes, such was supplied to the City on March 23, 2015.  The March 23, 2015, letter indicated the following as "liable parties:"  Coupe, Perez, the City, CCSPD, and "various additional Coral Springs police personnel whose identities are unknown at this time."

## CASE OVERVIEW

16.     This case concerns two out-of-jurisdiction City veteran municipal police officers (Coupe and Perez) who, while acting under color of law, attempted to make what amounted to a conceptually flawed *misdemeanor* citizen's arrest of the Mr. Rebalko, an elderly disabled local attorney.  The arrest precipitated from an order issued by Coupe to Mr. Rebalko, requiring a course of action that was not only far beyond Mr. Rebalko's physical capability to perform but also intrinsically dangerous and unlawful.  That is, the order was flawed for factual reasons (*e.g.*, beyond the officer's lawful discretion to give, too inherently dangerous to perform, and violative of Chapter 316 of the Florida Statutes, if performed) and legal reasons (*e.g.*, Coupe was out-of-jurisdiction at the time and accordingly unable to issue any lawful orders).  When Mr. Rebalko attempted to do nothing more than point out to Coupe his personal safety concerns and physical difficulties preventing compliance, Coupe arrested him for obstruction.  Coupe then took Mr. Rebalko into custody where he unnecessarily languished in two different jail facilities over a course of two days because Coupe slow-walked the arrest report through the system.  It is submitted that Coupe's only reason for causing this protracted incarceration was for the same reason as the arrest, Coupe's demonstrated dislike for those of the legal profession.  That is, while giving testimony in the criminal proceedings following the arrest, Coupe ultimately abandoned his officially cited reason for the arrest (obstruction), admitting that he (unconstitutionally) arrested Mr. Rebalko for the sole (malicious) purpose of silencing a lawyer.  In all likelihood, realizing the dubious arrest facts, Coupe and his fellow officer (Perez) colluded to draft a series of fanciful reports for the purpose of disguising the true unlawful nature of the arrest, including deceitfully placing the arrest at a fictitious location within their municipal boundary in an effort to obfuscate the highly problematic jurisdictional issue.

17.     Based upon their review of the arrest documents, in tandem with independently secured facts, the SAO declined to file charges citing as reasons the doubtful nature of key facts reported by Coupe and Perez and the officers' out-of-jurisdiction status at the *real* place of arrest – the SAO's reasoning constituted a rather clear rejection of the officers' factual accounts.

18.     Following this initial arrest disposition, Mr. Rebalko provided the City with a claim notice, seeking redress for the false arrest along with other documents concerning an ongoing dialogue between Mr. Rebalko and the City involving conflicts that had arisen over the City's ongoing perceived transgressions while using Mr. Rebalko's neighborhood's private road. Although Mr. Rebalko's claim notice was personal, his contacts with the City regarding the private road issue was in his capacity as legal counsel and president of a neighborhood association that manages the private road.  Upon receipt of Mr. Rebalko's liability claim notice and related civil road dispute materials, the City retaliated by engaging policymaking level personnel to place sufficient pressure upon the SAO to file criminal charges against Mr. Rebalko.   Based upon information and belief, Mr. Rebalko contends that the City's advocacy included material misrepresentations and deliberate legal distortions.   The City pursued this misguided course with full knowledge of the elementary threshold legal issues that rendered the arrest unlawful. Following a twenty-seven-month prosecution and the expenditure of thousands of dollars in costs and legal fees, the case was eventually dismissed for essentially the same threshold reasons that supported the SAO's decision not to file charges in the first place.

19.     Mrs. Rebalko is joined in this action as an associated person with standing under the asserted ADA claim.  She also has standing for having experienced her own extreme emotional and mental distress as the target of Coupe's outrageous verbal assault upon her because she "dared" engage Coupe in a plea for her husband to be released under a notice to appear rather than sending

him to jail. Unless Coupe's personality structure is uniformly problematic, it appears his animosity for attorneys probably extends to attorney spouses too.

20.     While Mr. Rebalko was still at the arrest scene, both Coupe and Perez were fully informed of Mr. Rebalko's various disabilities that precluded him from following Coupe's (unlawful) order without Coupe's willing traffic assistance.  Coupe responded to the accommodation need presented by challenging Mr. Rebalko's disability while Perez would later shrug off his accommodation responsibilities toward the disabled by postulating that disabled people simply should not drive.

21.     Federal claims are hereby brought under the First, Fourth, and Fourteenth Amendments to the Constitution of the United States of America, Title 42, United States Code, Section 1983, Title II of the ADA, and Title 29, United States Code, Section 701, *et seq*.  This suit also includes appropriate pendent state claims.

## FACTUAL ALLEGATIONS IN SUPPORT OF PLAINIFFS' CLAIMS

*Facts Describing Coupe's and Perez's Unlawful, Abusive, Arbitrary and Malicious Misconduct Leading Up to Plaintiff's Arrest and Facts Involving Coupe's and Perez's  Unlawful, Abusive, Arbitrary and Malicious Misconduct Concerning Mr. Rebalko's Arrest and Post-Arrest Activities*

22.     This civil action arises from law enforcement conduct committed on March 4, 2015, under color of law.  All activities took place upon private property partially owned by Plaintiffs and others.  Since 2006, this property has been situated wholly within the City of Parkland, Florida. By 2015, Coupe had been a several year senior level veteran of detective rank with CCSPD.  Perez had also been detective rank and employed by CCSPD for a protracted period of time. Accordingly, by this date it would be reasonable to factually conclude that both Coupe and Perez were thoroughly familiar with such routine and perfunctory aspects of their duties such as the geographic boundaries of the City they regularly patrolled and worked in.

23.    At all material times, both Coupe and Perez were acting under color of law and within the ostensible course and scope of their employment when they initiated and engaged in a warrantless and out-of-jurisdiction drug search while wholly within the City of Parkland, Florida. At said time and place, neither Coupe nor Perez made any attempts to gain extra-jurisdictional legal authority to act as *bona fide* police officers.  Further, Plaintiffs' work product and investigative efforts reflect that this warrantless and out-of-jurisdiction search precipitated from an act of racial profiling that occurred earlier in the day combined with the officers' harboring a personal dislike of the targeted suspect.   Other than the significant inconvenience and consternation endemic to arbitrary / capricious governmental harassment of this nature, predictably, this arbitrary / capricious police action netted neither contraband nor a criminal arrest of the suspect.

24.    Based upon the circumstances, both experienced municipal officers knew or should have known they had no legal authority or legal basis to initiate and engage in law enforcement activities at this geographic location.  In short, both municipal officers were acting under color of law, but otherwise attempting to assert legal authority at a place where they had none, motivated by an unreasonable, improper, and discriminatory purpose mixed with feelings of personal animus toward the suspect.

25.    While engaged in this unlawful conduct and unproductive use of public resources, Coupe and Perez parked (and then left unattended) their large unmarked SUV police vehicle within a City of Parkland intersection, although the practice of leaving an unattended police vehicle within an intersection for any period of time is clearly prohibited by their department's internal rules and regulations.  The practice also violates statewide traffic laws.  More specifically, they left their vehicle at the intersection of Godfrey Road (a narrow private way) and Wiles Road (a major county

highway).  At that location a standard stop sign controls Godfrey Road traffic, affording the right

of way to vehicles on Wiles Road where the applicable speed limit was 45 mph.  At the time of

the incident, rush hour traffic was well under way so traffic in and around the subject intersection

was quite busy.

26.      While their unmarked police SUV was parked in this intersection, Mr. Rebalko,

driving a compact low-profile vehicle, approached the intersection from the North, *via* Godfrey

Road.  Upon arrival at the intersection, Mr. Rebalko immediately noted the large SUV parked in

the intersection, as well as the congested and stacked up traffic caused by the SUV's partial cutoff

of access about the intersection.  After stopping near the stop sign, Mr. Rebalko attempted to leave

his neighborhood by turning out onto Wiles Road, but because of the visual obstruction caused by

the high-profiled SUV vehicle, he was unable to see over it (due to its height), see through it (due

to it being equipped with dark reflective glass), and was unable to see around due to its location

within the intersection.  Although Coupe stood nearby and observed Mr. Rebalko's difficulty with

turning onto Wiles Road, he inexplicably made no effort to assist while shouting out directives to

Mr. Rebalko to turn out onto Wiles Road in callous disregard of the safety of Mr. Rebalko and all

other motorists that could have collided with Mr. Rebalko had he blindly pulled into traffic.   Mr.

Rebalko initially sought to comply with Coupe's order to turn, but after multiple attempts he found

himself unable to safely progress beyond the stop sign.   This led to a brief non-confrontational

exchange between Mr. Rebalko and Coupe, with Mr. Rebalko requesting help and Coupe ignoring

his repeated pleas.  That is, instead of helping, Coupe repeated his demand that Mr. Rebalko

(blindly) turn onto Wiles Road and into the heavy rush hour traffic, but without offering any traffic

assistance to allow Mr. Rebalko to successfully negotiate the extremely difficult, if not impossible,

traffic maneuver demanded of him.

27.     Eventually, a car approached Mr. Rebalko's vehicle from the rear, boxing him in, thus preventing Mr. Rebalko from moving forward or backward.   Realizing he had no ability to drive anywhere and that circumstances rendered it unsafe for him to remain a stationary sitting duck, he exited his car and approached Coupe thinking this would provide him with a better opportunity to converse with Coupe and reach a reasonable solution.  Mr. Rebalko sought to start the conversation by making two quick points.  First, to clearly speak to the physical difficulties and practicalities precluding his ability to proceed.  Second, to express his legitimate imputed legal liability concerns with the SUV being left in the intersection by establishing his relevance to this concern as a road owner, president of the governing road association, and legal counsel for the road association.  Mr. Rebalko began by introducing himself, indicating his physical limitations and explaining his connection to the road, however, as soon as Mr. Rebalko got out the word "attorney," Coupe immediately cut him off by mockingly repeating the word "attorney" while ordering him to place his hands behind his back.  Mr. Rebalko promptly complied.  He was then handcuffed, placed under arrest, admonished for not leaving the neighborhood while he still had the chance, and then shoved to the ground for no reason … not to mention in the vein of unnecessary physical force exerted by Coupe, Coupe also later remarked to Mrs. Rebalko that he was poised or tempted to employ a taser on Mr. Rebalko, compounding Mrs. Rebalko's distress (among other things).  Mr. Rebalko could not help but note the immediate abruptness of Coupe's hostile attitude immediately upon hearing the word "attorney," as well as his accentuated mocking tone while articulating the word.  Notwithstanding Mr. Rebalko's fully cooperative behavior, for no apparent reason Coupe shoved Mr. Rebalko to the ground after he was handcuffed.

28.     While under arrest but still at the scene, Mr. Rebalko again sought to open an explanatory dialogue with Coupe by being forthcoming about his disability and concomitant

impaired driving skills due to cervical / range of motion limitations caused by cancer-related radiation treatments to his neck, to which Coupe antagonistically replied by refuting his disability status.   At this time, Mr. Rebalko clearly informed Coupe and Perez that the parties were in a City of Parkland neighborhood rather than a Coral Springs neighborhood.

29.    Even without Mr. Rebalko's express advisement, given the significant number of cumulative years of job experience shared by Coupe and Perez, it is reasonable to conclude that both municipal officers knew or reasonably should have known they were engaged in law enforcement activities beyond their own City limits.   Knowing this, they would have also known they had no legal authority where they were, as well as the fact that they did not take (and were not going to bother to take) those steps needed to confer lawful authority upon their color of law police activities, such as drug searches or issuing orders or making arrests without first securing a lawful jurisdictional predicate.

30.    A few minutes after Mr. Rebalko's arrest and while he was still on the scene, Mrs. Rebalko arrived and approached Coupe in a polite and non-confrontational manner, inquiring about her husband being detained.   In a loud and boisterous voice, Coupe exclaimed "He is going to jail!"   This prompted Mrs. Rebalko to ask "Why?", to which Coupe proclaimed "For endangering my life," although shortly thereafter he admitted to Mrs. Rebalko that her husband had not been aggressive toward him in any way.   This prompted Mrs. Rebalko to inquire of (and then literally beg for) Coupe to release her husband under a notice to appear, citing his disabling health problems, medication needs, and her husband's lengthy and significant community ties.   This notwithstanding, Coupe remained adamant that Mr. Rebalko was going to jail.   In his interactions with Mrs. Rebalko, Coupe presented himself in an inappropriately unreasonable, harsh, swaggering, gloating, disrespectful, and bullying manner, in obvious awareness of and

abuse of the power relationship he enjoyed over her … and, again, there was Coupe's remark to Mrs. Rebalko that he was poised or tempted to employ a taser on Mr. Rebalko. This calculated display quickly reduced Mrs. Rebalko to a state of overwhelming mental and emotional distress.

31.     Perez participated in parking and leaving the unattended department SUV in the intersection and he took the lead role in the unlawful drug search that began the domino effect culminating in Mr. Rebalko's arrest. Perez also witnessed all facts and circumstances surrounding Coupe's arrest of Mr. Rebalko, as well as his acts of verbal misconduct at the scene. Perez was also privy to the disability disclosures made by both Mr. and Mrs. Rebalko. Notwithstanding this privity, Perez made no effort to intervene and put a stop to Coupe's outrageous behavior. Accordingly, it is fair to say that Perez acted as an enabler of and accessory to Coupe's plainly unreasonable, abusive, and ultimately unconstitutional and unlawful conduct.

***The Post-Arrest Malicious, Capricious, Arbitrary, Bad Faith, Collusive and Conspiratorial Acts of all Named and Unnamed Defendants***

32.     Coupe's misguided cover-up / bootstrap scheme to somehow give legitimacy to an arrest that was unlawful and void *ab initio* was immediate. First, he dispensed with his original "suspect" (who at this point had been elevated to the status of a civilian witness as to the place and circumstances of Mr. Rebalko's arrest) by aborting his initial "criminal search" and cutting the suspect loose without any further ado.   *Nowhere is this person's actual identity ever revealed in the lengthy reports authored by the officers*.

33.     Coupe next embarked upon the nefarious project of drafting a series of false narrative / cover-up arrest documents that centered around affording the indicia of legal jurisdiction to a clearly unlawful arrest. Coupe later admitted to his pecuniary fear that, given Mr. Rebalko's attorney status, he was surely going to be sued for a bad arrest … unless, of course, he could convince the SAO that the arrest was legally proper. It is cogent to note here that Coupe

later admitted that Mr. Rebalko never once verbally threatened to sue him, rendering his probable guilt driven paranoia entirely self-inflicted.

34.     It is also worthy of mention that when Coupe began writing his lengthy and circuitous police report / probable cause false affidavit narrative, and for hours thereafter, Mr. Rebalko was being held in a jail facility located in the same building as Coupe, with the two being separated from each other by feet.  This proximity afforded Coupe ample time for the calm of reflective hindsight to override any momentary lapses of judgment allowing him to reach a sober decision to release Mr. Rebalko from jail in mitigation of the consequences of his earlier bad decisions.   But because Coupe's actions were grounded in malicious, intentional, and discriminatory animus toward the legal profession, reversing course was not within the realm of possibility.   To the contrary, Coupe spent the evening meticulously putting together a series of rambling false narrative cover-up narratives in hopes that the arrest facts would turn out to be nothing more than a he said / she said dispute.  In furtherance of this hope, he intentionally misrepresented the *situs* of the arrest, by haplessly placing the arrest at a nonexistent address in the City of Coral Springs rather than where it actually occurred in the City of Parkland.  By this deceit, Coupe hoped to eliminate the highly problematic jurisdictional issue that he knew torpedoed the legality of Mr. Rebalko's arrest.   In the end, Coupe's narratives included a host of fabricated details and an incredulous chain of events knowing that these reports would be relied upon by prosecuting authorities in determining the propriety, *vel non*, of filing charges. Meanwhile, Perez filed his own report dovetailing Coupe's reports.  Plaintiffs further allege that the final documents submitted by the CCSPD to the SAO involved acts of collusion between Coupe and Perez, their direct supervisor(s) and potentially others, herein designated as John Does I—X.

35.     After several hours of languishing in the City jail facility, Mr. Rebalko was next transferred to the distant Broward County main jail facility in Fort Lauderdale where he languished until the afternoon of the following day, as Coupe intentionally protracted Mr. Rebalko's incarceration by slow-walking his paperwork knowing that his paperwork was necessary to allow Mr. Rebalko a ministerial scheduled bond release.   Meanwhile, Mrs. Rebalko, worried sick and unable to sleep, maintained a 24/7 vigil repeatedly calling the jail facility and bail bondsmen in hopes of being there to comfort her husband upon his release, dispense medications without further delay, and provide him with an immediate ride home.  Meanwhile, Mr. Rebalko, by now in need of his medications, was rendered completely disoriented and traumatized by the intentional mental and emotional distress that one would expect a law-abiding citizen to experience in a jail environment.   This was the exact goal and result that Coupe intended.   In common police vernacular, it is referred to as one beating the charges but not beating the ride.

36.     Following his release from jail, Mr. Rebalko retained counsel to handle the impending criminal charges.  This led to a series of phone calls and correspondence between his criminal counsel and the SAO's filing department to allow for a thoughtful review of all significant issues at hand dispositive of reaching a fair decision on whether charges should be filed.  After all was said and done, the SAO ultimately opined that Coupe's written account was simply too factually dubious to file charges on and that he otherwise lacked legal authority because the arrest occurred outside his City.  Accordingly, the SAO declined to file charges and wrote a file memo explaining this decision.

37.     Upon being advised of the SAO's decision declining to file charges, Mr. Rebalko delivered a standard statutory claim letter to the City along with other correspondence in his capacity as attorney and president of the road association charged with legal responsibility for the

road's management.   Immediately thereafter, the City retaliated by putting pressure upon the SAO to file charges against Mr. Rebalko.  This was done in backdrop of the ongoing road use dispute and for the self-serving purpose of staving off the immediate civil repercussions presented by the SAO's no file decision, thus allowing the can to be kicked down the road with the further hope that the minor charge would predictably end with an alternative resolution plea deal, thus absolving the Defendants of legal liability attendant to the bad arrest.

38.    Due to the criminal court judge's *Brady* concerns over the filing decision anomaly, defense counsel in that case obtained a court ruling permitting his review of the entire SAO file, including their fact and legal work product notes.  Attendant thereto, defense counsel reviewed the SAO file entry explaining their decision not to file charges and a later memo in explanation of their decision not to oppose a defense motion designed to gain dismissal of the case.  *Conspicuous by its absence is any mention of the circumstances and reason(s) to justify their earlier about face resulting in formal charges being filed against Mr. Rebalko.*

39.    Ultimately, Mr. Rebalko was charged under a single count information charging him with the misdemeanor of failing to obey Coupe's demand to turn onto Wiles Road.  A twenty-seven-month criminal prosecution ensued.   Following defense counsel's investigative and criminal defense efforts consisting of robust discovery, the filing of various motions, and a series of hearings and court appearances, an order was entered by the court dismissing the criminal charge as defense counsel's motion to dismiss was not traversed by the SAO.  Following the dismissal, Mr. Rebalko served the City with a second statutory notice, which included an additional claim for malicious prosecution.

## ALLEGATIONS RELEVANT TO ALL COUNTS

40.     On the date of arrest (March 4, 2015), Mr. Rebalko was 62-years-old and Mrs. Rebalko was almost 60-years-old.

41.     Plaintiffs were residents of Country Acres, a neighborhood wholly situated within the City of Parkland, Florida.  They began their residency in Country Acres in 1992.

42.     Mr. Rebalko is (and has been) a member of the Florida Bar since 1979.

43.     For the past several years, Mr. Rebalko has been afflicted with major health issues involving his treatment for metastasized head and neck cancer that included systemic chemotherapies and focused radiation therapy to both his head and neck regions.  Among other degenerative physical and mental morbidities, the radiation caused plenary fibrosis throughout the soft tissue area of his cervical region.  Mr. Rebalko is afflicted with significant cervical rotation limitations and range of motion impairment, which greatly restrict his ability to stretch his neck and head forward and from side-to-side.  Mr. Rebalko's treatment modalities have resulted in a significant depreciation of his cognitive skills and also a hearing defect (tinnitus).  In addition to his cancer-related morbidities, Mr. Rebalko suffers from a history of an L4/L5 disc herniation and L5/S1 disc herniation requiring him to be guarded in his movements regarding his back.

44.     Mr. Rebalko's loss of cognitive skills are compounded by the side effects of his medications, all of which work to slow down his reaction time and the rate at which his brain is able to mentally processes information.  These cognitive skill deficits proved debilitating to the point of requiring his retirement from the active practice of law.

45.     These physical and mental impairments require Mr. Rebalko to exercise extreme caution while driving, which he does.  Indeed, the State of Florida has acknowledged Mr. Rebalko's cautious driving habits by issuing him a driver's license marked "Safe Driver."

46.     The aforementioned impairments mean that Mr. Rebalko is a qualified individual with a disability under the ADA.

47.     On March 4, 2015, Mr. Rebalko was trying to leave his City of Parkland neighborhood, but was prevented from doing so by Coupe's agency vehicle (a 2015 full-size Ford Explorer SUV) that was obstructing an intersection that constitutes the sole means of access to and from his neighborhood.  This is where Godfrey Road (Mr. Rebalko's private road) intersects with Wiles Road (a 45mph major multilane county highway).  For even the most causal of reasonable minded observers, the location of Coupe's vehicle in the intersection presented a clear and present safety hazard to any motorist attempting to get through the intersection.

48.     From his car, Mr. Rebalko advised Coupe of his inability to sufficiently see around his SUV vehicle to allow him to safely pass through the intersection, but Coupe's only action was to order him to venture out into the intersection on an unassisted basis.   Under the circumstances, Coupe's idea was both ridiculous and reckless.  This conflict of ideas (Mr. Rebalko being reasonable and sane with Coupe's being unreasonable and life-threatening) quickly led to an impasse.  After being hemmed in by the increasing line of cars, Mr. Rebalko no longer felt safe in his vehicle, being aware that his small car was completely dwarfed and in the overshadow of Coupe's SUV and therefore in danger of being struck head-on by a car attempting to turn into the neighborhood around Coupe's car.  For this reason, Mr. Rebalko exited his car and approached Coupe with the hopes of the two reaching an amicable and reasonable solution to the problem.

49.     Upon approaching Coupe, Mr. Rebalko reiterated his safety concerns and professional duties in management of the private road.  The conversation began with Mr. Rebalko's quick mention of his role as president and attorney for the controlling road association.  As soon as the word "attorney" left his lips, Coupe contemptuously repeated the word "attorney,"

ordering him to put his hands behind his back and further saying "I'm not going to hear it anymore, you are under arrest."[2]   At the point of arrest, Coupe estimates his entire interaction with Mr. Rebalko lasted a matter of seconds.  Coupe never instructed Mr. Rebalko to stay in his vehicle or to go back to his vehicle.

50.     Mr. Rebalko promptly and fully complied with being handcuffed and all other arrest procedures which render inexplicable Coupe's act of using excessive force in shoving Mr. Rebalko to the ground.

51.     At the time of arrest, Mr. Rebalko fully informed Coupe of his cancer-related disabilities and, in particularly, his highly relevant cervical rotation limitations.   Coupe dismissively responded to this disability disclosure by capriciously refuting Mr. Rebalko's disability status.

52.     Mr. Rebalko was still handcuffed and at the arrest scene when Mrs. Rebalko arrived.  Upon seeing his restraint, Mrs. Rebalko inquired of Coupe as to why her husband was in handcuffs and if he would be released.  Coupe said that Mr. Rebalko was under arrest and then exclaimed: "He's going to jail"!  It was then that Mrs. Rebalko spoke to Coupe and Perez over her worries focusing upon her husband's impaired health, disability status, and health concerns should his medication protocol be suddenly interrupted.

53.     Mrs. Rebalko, now in a state of panic and despair, was so distraught that she had a neighbor drive her to the CCSPD station to check on her husband and in hopes of attempting to gain his release without further ado.  Here she reiterated her medical and safety concerns for Mr.

---

[2] In the maliciously prosecuted criminal case against Mr. Rebalko, a wealth of evidence (including deposition testimony from Coupe and Perez) was obtained.  The record from the maliciously prosecuted criminal case is publicly available (*State of Florida v. Lee Rebalko*, No. 15-2647MM10A-Lerner-Wren (Fla. 17th Cir. Ct.) and is therefore herein referenced.

Rebalko and again sought to gain his release through the issuance of a standard notice to appear, emphasizing all qualifying factors.  In response, she was advised that the issuance of such a notice was strictly up to the arresting officer (Coupe) and he remained adamant that Mr. Rebalko was going to jail.

54.     Mr. Rebalko was initially incarcerated at the City's jail facility where he first went through the humiliation and indignities of the jail processing protocol.  There he was left to languish in a freezing holding cell dressed in nothing but summer clothes and offered no humane thermal comforts at all.  Shortly before midnight he was chained to a rowdy inmate and transported to Broward County's main jail facility.  Upon arrival, Mr. Rebalko went through an even greater humiliating and dehumanizing processing experience and was then placed in a large / crowded temporary holding cell, where among boisterous law breakers he remained awake all night. Sometime shortly after daybreak, Mr. Rebalko was taken from the holding cell, chained to a group of prisoners, and moved to a pod housing cell, where he remained until he was released sometime in the afternoon.

55.     During the entire horrific jail experience, Mr. Rebalko was deprived of sleep and his prescribed medications while Mrs. Rebalko also went without sleep waiting and worried sick about her husband's safety and wellbeing.  Jail personnel documented Mr. Rebalko's drastic stress when they tested his blood pressure.

56.     The extended duration of Mr. Rebalko's incarceration on a minor charge was solely attributable to Coupe's retaliatory decision to delay filing a booking report necessary to secure a scheduled ministerial release bond.

57.     A more extensive documentation of the facts of this case can be found in the sworn motion to dismiss filed in *State of Florida v. Lee Rebalko*, No. 15-2647MM10A-Lerner-Wren (Fla.

17th Cir. Ct.).  That motion (as well as the entire underlying criminal proceedings record, *see* footnote 2, *supra*) are mentioned for at least a couple reasons.  First, Plaintiffs wish to adhere (as best as possible) to Federal Rule of Civil Procedure 8(a)(2) ("a *short and plain* statement of the claim showing that the pleader is entitled to relief," emphasis added).  Second, the public record that already exists by way of the resolved companion predicate criminal case naturally shines an unflattering (to put it mildly) light on Defendants and this lawsuit does not seek to drag Defendants through the proverbial mud; rather, this lawsuit seeks to redress Plaintiffs and, hopefully in the process, lessen the chances of recurrence / recidivism (either with respect to Plaintiffs or the community as a whole).  As a professional courtesy to both the Court and prospective opposing counsel, Plaintiffs stand ready to provide any and all criminal case materials upon request.

## COUNT I – DEFENDANTS' DEPRIVATION OF FEDERALLY PROTECTED RIGHTS

Paragraphs 1 through 57 are realleged as if fully set forth herein, and it is further alleged that:

58.     Title 42, United States Code, Section 1983 provides, in pertinent part, as follows:

Every person who, under color of any statute, ordinance, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress … .

*Id.*  Title 42, United States Code, Section 2000e(a) provides, in pertinent part, as follows:  "[t]he term 'person' includes one or more individuals, governments, governmental agencies, political subdivisions … ."  *Id.*  Title 42, United States Code, Section 2000e(i) provides, in pertinent part, as follows:  "[t]he term 'State' includes a State of the United States … ."  *Id.*

59.     Title 42, United States Code, Section 1988(a) provides, in pertinent part, as follows:

The jurisdiction in civil … matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in

the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, a modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil … cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause … .

*Id.*

### Section 1983 First Amendment Based Claim

60.     The First Amendment to the United States Constitution states:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."  Obviously, many published opinions exist involving the struggle to reach a fair resolve balancing the interest of the police being able to effectively do their job versus First Amendment protections of those who interact with police during the course of their law enforcement activities.  Relevant to the First Amendment claim are the body of opinions and settled law dictating that mere verbal expression challenging police action is not enough to warrant an arrest for obstruction, the express violation cited for Mr. Rebalko's arrest.  The usual type of speech that warrants arrest for obstruction is where, unlike here, the offender's words are designed to directly impede the police in the performance of a duty, (*e.g.*, aiding a suspect by giving him / her guidance as to how to escape out a back door or shouting out to a suspect the location of a toilet to allow the disposal of contraband).  Here, in the prior criminal proceeding, Coupe admitted, under oath, that his reason for arresting Mr. Rebalko was to silence his (protected) speech.  At no time did Mr. Rebalko engage Coupe in conversation extraneous to his immediate needs and concerns. At no time did Mr. Rebalko use words that could have been

23

construed as a threat of any kind to Coupe or as an aid to Coupe's initial criminal suspect.   In sum, Mr. Rebalko's words were entirely constitutionally protected.

61.     By virtue of their lack of any jurisdictional / lawful to act authority, neither officer can make claim to a qualified immunity protection.  Their conduct constituted a clear violation of Mr. Rebalko's First Amendment rights as they contravened clearly established statutory and / or constitutional rights of which a reasonable person (police officer) certainly would have and should have known.   To arrest someone for the purpose of silencing protected speech is *per se* unconstitutional and an abridgement of civil rights.

***Section 1983 Fourth Amendment Based Claim***

62.     The Fourth Amendment to the United States Constitution provides as follows: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  *Id.*  "An individual's right to be free from unreasonable seizures under the Fourth Amendment is violated when a law-enforcement officer arrests the individual without probable cause."  *Hayden v. Broward County, et al.*, No. 12-62278-CIV-ROSENBAUM/SELTZER (S.D. Fla.) May 9, 2014, Order on Motions to Dismiss at 9 (citing *Rushing v. Parker*, 599 F.3d 1263, 1265 (11th Cir. 2010)).  "Probable cause exists 'when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"  *Id.* (citing *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013)).  "The existence of probable cause is an 'absolute bar' to an action for false arrest under § 1983."  *Id.* at 10 (citing, *inter alia*, *Myers* at 1328).

24

However, this protection does not come into play under the instant facts as the concept of probable cause applies to law enforcement acts taken by police officers empowered with lawful authority.

63.     The "Fourth Amendment's prohibition against unreasonable seizures provides protection against the use of excessive force by law-enforcement officers during the course of a lawful arrest, investigatory stop, or 'other seizure of a free citizen.'" *Id.* at 15 (citing, *inter alia*, *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  "'When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest.'" *Id.* at 15-16 (citing *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006)).  "'The inquiry into whether any given use of force is 'reasonable' under the Fourth Amendment is an objective one that requires a careful balancing of 'the nature and quality of the intrusion' and the 'countervailing governmental interests at stake.'" *Id.* at 16 (citing *Graham* at 396-397).  "Evaluating an excessive-force claim requires 'careful attention to the facts and circumstances of each particular case,' including, among other things, the relationship between the need for force and the amount used and the extent of the injury inflicted." *Id.* (citing, *inter alia*, *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009)).  Here, any physical interaction with Mr. Rebalko was nonconsensual and therefore excessive as a matter of state tort law as the officers' only status at the time was that of acting as private citizens.  Under Florida law, there exists no such thing as a private citizen effectuating an arrest for a misdemeanor, as this private citizen right only applies to a felony arrest. Moreover, Coupe's act of shoving Mr. Rebalko to the ground while handcuffed was entirely unnecessary and therefore excessive, particularly given his advanced age and disability status.  The only rational explanation for this obvious display of excessive force is Coupe's personal animus toward members of the legal bar.

64.     Here, Mr. Rebalko's Fourth Amendment rights were violated by Coupe and Perez when, under color of law, they deprived him of his freedom by unconstitutionally seizing, restraining, manhandling, shoving, and finally falsely imprisoning him over a two-day period, all without any legal authority to act.  All physical force used was excessive (in particularly the gratuitous shove to the ground) in that neither municipal officer had any legal right to place their hands upon Mr. Rebalko due to their lack of jurisdiction status and lack of lawful ability to so act. That is, any and all force used by Coupe and Perez in physically restricting Mr. Rebalko's liberty would be unnecessary and disproportionate so as to contravene the Fourth Amendment.  Neither Coupe nor Perez can claim they were engaged in any lawful duty, as both officers were acting outside their jurisdictional boundary and neither officer took steps to confer extra-jurisdictional authority.  Accordingly, at the time, their only status was that of mere private citizens, standing on private property without invitation.  In this regard, to prevent law enforcement officials from misusing the powers of their office in making a citizen's arrest, Florida courts have uniformly held that law enforcement officials may not make a citizen's arrest under the color of their office— exactly what was attempted by Coupe and Perez.

65.     By virtue of their lack of any jurisdictional authority, neither officer has any qualified immunity protection.  Their conduct constituted a clear violation of Mr. Rebalko's Fourth Amendment Rights as they contravened clearly established statutory and / or constitutional rights of which a reasonable person (police officer) certainly would have known.

***Section 1983 Fourteenth Amendment Equal Protection Based Claim***

66.     Section 1983 and the Fourteenth Amendment protect Mr. Rebalko from class-based discrimination.  It is axiomatic that equal protection claims stem from acts of arbitrary / capricious discrimination against a defined class or even an individual class of one.

67.     As for Coupe (as well as his accessory, Perez), circumstantial facts create the strong plausibility that the actual underlying motive for Mr. Rebalko's arrest relates to a desire to act out a discriminatory class-based animosity toward those of the legal profession.  Such a conclusion is plausible based upon the existence of a direct temporal relation between Mr. Rebalko's introduction to Coupe as an attorney, followed by Coupe's immediate mocking use of the word "attorney" simultaneous to his ordering Mr. Rebalko to put his hands behind his back to be handcuffed.  Further prejudice can be gleaned from the fact that Coupe refused to release Mr. Rebalko under a standard notice to appear although, absent a prejudicial motive, Mr. Rebalko reasonably and clearly met all standard criteria to be released under his own recognizance:  (a) strong community ties and standing, (b) lack of criminal record, and (c) minor nature of the misdemeanor (resisting arrest without violence charge).  Rather, Coupe and Perez wanted their pound of flesh exacted upon an attorney by assuring that Mr. Rebalko would experience jail time regardless of the ultimate merits and legality of the arrest.  In the end, after exhausting all angles, Coupe testified in the underlying criminal case that he refused to issue a notice to appear noncustodial release based upon the entirely incredulous (if not preposterous) claim that Mr. Rebalko did not deserve a noncustodial because Mr. Rebalko endangered his life.  Under oath when pressed to justify this outrageous claim, Coupe was unable to cite a single specific example of any act of aggression by Mr. Rebalko – Coupe only came up with the ridiculous idea that turning his head to speak to Mr. Rebalko was enough to justify his endangerment claim.  Frankly, given the quantum amount of factual development that went into Mr. Rebalko's criminal defense, Coupe's perceived threat to his life explanation is patently absurd and constitutes an outrageous abuse of his perceived (but nonexistent) authority.

68.     Also worthy of mention is that at the scene of the arrest Mrs. Rebalko (a non-attorney) engaged both officers in considerably more conversation than her husband.   She was not arrested and she was not accused of endangering lives.   Frankly, engaging law-abiding citizens in conversation during the course of police action would appear to be a normal and ordinary day-to-day occurrence in the lives of police officers while at work serving the public.

69.     Also relevant to this claim of discrimination is the palpable arrogant disrespect and contempt Coupe displayed toward defense counsel when he sat for his deposition in the underlying failed criminal prosecution.

70.     In the end, the conduct of Coupe and Perez constituted disparate and arbitrary treatment in violation of Mr. Rebalko's equal protection rights, as Mr. Rebalko was intentionally treated differently from other law-abiding citizens (non-attorneys) similarly situated.   At all material times, Mr. Rebalko's behavior was entirely law-abiding and law-abiding citizens are not ordinarily seized and jailed by law enforcement officers particularly when the law enforcement officer is out of jurisdiction.   Nor are citizens who meet the standards for release under a notice to appear usually denied this equitably earned treatment, a treatment for which this process is specifically intended and designed to be used.

### Section 1983 and Constitutional Claims Against the City

71.     The Fourteenth Amendment (Section 1) to the United States Constitution provides, in pertinent part, as follows:  "No state shall make or enforce any law which shall abridge the privileges or immunities of any citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  *Id.*

72.     At all material times, the City was a local government / municipality organized under the laws of the State of Florida.

73.     At all material times, the City was a "person" under Section 1983.

74.     Obvious Constitutional protections guaranteed under the Fourteenth Amendment are the right to equal protection of the laws and procedural due process based on the concept of fundamental fairness.  As more particularly alleged above, the City actively engaged in furthering the blatantly groundless prosecution of Mr. Rebalko by refusing to accept the SAO's decision not to file charges on Coupe's March 4, 2015 arrest.  The SAO's decision to decline filing charges was in recognition of the fact that the arrest appeared dubious and was plainly unlawful for core jurisdictional reasons.  Following receipt of Mr. Rebalko's subsequent notice of claim and related road dispute communications, the City, by and through the acts of policymaking level personnel or persons specifically directed by such policymaking level personnel, successfully exerted pressure upon the SAO to file charges against Mr. Rebalko, notwithstanding actual knowledge of the meritless nature of any such prosecution.  In furtherance of their advocacy, the City misrepresented relevant jurisdictional facts and distorted applicable legal precedent.  A twenty-seven-month prosecution ensued with all the attendant anxieties and costs caused thereby.  Moreover, the instigation of Mr. Rebalko's criminal prosecution constituted the City's tacit approval of Coupe's and Perez's unlawful and unconstitutional mistreatment of Mr. Rebalko, as more fully alleged above.

75.     It was fundamentally unfair of the City to successfully advocate Mr. Rebalko's prosecution as the advocacy was entirely motivated by improper self-serving motives including pecuniary interests.  That is, the City viewed itself more vulnerable to civil suit when, as here, the SAO initially refused to file charges, as opposed to disposition of the prosecution through a minor

29

plea agreement culmination (the City's expected and hoped for anticipated favorable resolve). Obviously, the City's motive was divorced from concepts of fairness and justice and would indirectly serve the purpose of dashing cold water on Mr. Rebalko's civil efforts to gain any cooperative concessions from the City as to the existing road use dispute.

76.     It would be preposterous to believe that the City gets involved in all decisions not to file charges on cases brought to them by members of their police department.   What distinguished this situation from the norm is Mr. Rebalko's status as one learned in the law and his involvement in a road use dispute with the City.   Ultimately significant is the temporal relationship between the City's receipt of Mr. Rebalko's claim notice, *et al.*, and their contact with the SAO urging Mr. Rebalko's prosecution.   This disparate treatment sets up two classes:  (a) citizens who are arrested by the City without charges being filed, and (b) citizens who are arrested by the City who present claims against the City when their cases are dropped by the SAO on a threshold basis but still within the timeframe for charges to be filed.   Under a separate but harmonious theory, Mr. Rebalko can also claim constitutional status as a class of one paralleling the fact pattern of *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).  Either as a general class or class of one, it is an improper prerogative of the City to expend political capital to advance nonjudicial criminal proceedings in order to protect their own agenda.  Mr. Rebalko contends that this disparate treatment served an improper purpose totally divorced from a legitimate governmental interest in the criminal justice system.   Section 1983 recourse is particularly appropriate under these facts because the City's advocacy of this meritless criminal prosecution was committed either directly or indirectly by policymaking level personnel, as more fully alleged above.

77. Mr. Rebalko further contends that a Section 1983 claim against the City is appropriate to the extent that he would not have been deprived of his federally protected rights under the First, Fourth, and Fourteenth Amendments, as well as the ADA, but for the City's inadequate training / education and / or supervisory policies, customs, usages, and / or practices relating to its administrative arms (*e.g.*, CCSPD) and / or personnel (*e.g.*, Coupe and Perez).

78. This analysis begins with viewing the March 4, 2015, mistreatment of Mr. Rebalko at the hands of CCSPD, Coupe, and Perez as the epitome of egregious unconstitutional and tortious misbehavior on a fundamental level.  In this connection, Coupe has already testified and given many examples reflecting the City's failure to train, adopt, implement, enforce, and / or oversee the conduct of its administrative arms (*e.g.*, CCSPD) and / or personnel (*e.g.*, Coupe and Perez), as follows:  (a) At their depositions in the underlying criminal case, both Coupe and Perez testified that they have no knowledge of ADA Title II police responsibilities owed the disabled, although the ADA has been the law of the land for decades.  (b) At their depositions in the underlying criminal case, both Coupe and Perez displayed their complete ignorance of the municipal borders that govern their jurisdiction to act as law enforcement officers.  (c) At their depositions in the underlying criminal case, both Coupe and Perez displayed a hapless understanding of and / or indifference for following the mandatory procedures needed to obtain extra-jurisdictional authority to act as legitimate law enforcement officers when outside the City.  (d) The facts of the case reflect both officers' entrenched cavalier lack of concern for disciplinary repercussions, even though they were aware that they were arresting an attorney who unequivocally advised them they were attempting an out-of-jurisdiction arrest.  Under ordinary circumstances, law enforcement officers are sufficiently disciplined to cross their t's and dot their i's, including obtaining supervisory review and approval when knowingly dealing with attorneys.  (e) Both Coupe and Perez displayed

31

no concern that their cover-up fabricated reports would meet with any repercussions from supervisors, even though they knew that these same supervisors had spoken with multiple credible people that reported the out-of-jurisdiction location of the arrest, as well as Mr. Rebalko's identity as an attorney.  This observation strongly suggests a complete disciplinary and supervisory agency breakdown.  (f) While being processed at the City police station following his arrest, Mr. Rebalko reiterated to station supervisors the out-of-jurisdiction location of his arrest.  By then, all such supervisors were aware of Mr. Rebalko's profession, a person presumptively knowledgeable as to which City his neighborhood (where his arrest occurred) is in.  Such an obvious legal red warning flag proved of no concern to any of them.  At the same time, these same jurisdictional concerns were separately expressed to police station supervisors by Mrs. Rebalko, as well as by a neighbor of local prominence who drove Mrs. Rebalko to the station.   Without any apparent rhyme or reason, the officers' lack of jurisdictional legal authority to arrest was of no moment to these supervisors either. (g) At their depositions in the underlying criminal case, both Coupe and Perez manifested only a sketchy understanding of their agency's internal rules and regulations that didactyly control their conduct while out in the field.  (h)  Both officers testified they had no knowledge of either the State's time-tested rescue doctrine or the police public duty doctrine.  Had either doctrine been followed (assuming respect for the law), the officers would have fulfilled their legal obligation to come to the traffic aid of Mr. Rebalko, rather than victimizing him.  (i)  Neither officer displayed a working knowledge for the discretionary limits of lawful orders (such as issuing orders that are inherently unsafe and / or contrary to statutory law; *e.g.*, ordering a driver to enter a highway without having a clear vision of oncoming traffic).  (j)   At his deposition in the underlying criminal case, Coupe essentially testified that when he leaves the station in the morning he does not need to report to anybody as to what he is doing or even where he is.  That is, according

to Coupe (who has been with his agency a very long time) the agency's culture allows him a long enough leash so that on the job accountability is irrelevant.  This lack of supervision, discipline, and training would certainly explain why he was at a place he should not have been, engaged in unauthorized police activities, and while so engaged without any legal status to be engaged.   (k) There is no rational reason to believe that somehow Coupe is vested with privileges unique to his agency.  From this, it is fair to conjecture that his seemingly renegade on the job conduct is probably ubiquitous throughout his agency.  (l)  Both Coupe and Perez are detectives, accordingly their rank is far from entry level.  If this is their level of dysfunctional professionalism, it is rational to presume that beat level personnel are even more dysfunctional.

79.     In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court explained that inadequate training could give rise to liability if in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of Constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent to the need.  The Court held that, under these circumstances, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible.

80.     Had the City's training / education and / or supervisory policies, customs, usages, and / or practices not been subpar, Mr. Rebalko would have been spared the nightmare that he endured for over two years (and, to some extent, still to this day; *e.g.*, malingering bewilderment and anxiety as to:  "If this happened to me once, it can happen again?  Will it?  When?  What can I do to make sure it does not happen again?  What can I do to protect my spouse and I?").  Practically speaking, it is not as if Mr. Rebalko can effectively divorce himself from these concerns

as his Parkland neighborhood is adjacent to the City, a City he drives through frequently to go about his daily affairs.

81.     Put differently, and in sum, there is an undeniable causal connection between the City's subpar policies, customs, usages, and / or practices and the deprivation of federally protected rights that Mr. Rebalko experienced.

82.     Mr. Rebalko has no other adequate remedy other than this lawsuit to address the harm he has suffered (and continues to suffer) as a result of the deprivation of his federally protected rights.

83.     As a further result of the deprivation of Mr. Rebalko's federally protected rights, Mr. Rebalko has been forced to retain legal counsel to represent him in this matter and is accordingly entitled to recover his reasonable attorney's fees, expert expense, and costs pursuant to Title 42, United States Code, Section 1988(b).

WHEREFORE, Plaintiffs respectfully requests the entry of judgment against the City, Coupe, Perez, and John Does I-X for damages including, but not necessarily limited to, the following:  compensatory damages, punitive damages (where applicable), attorney fees and costs pursuant to Title 42, United States Code, Section 1988 or are as otherwise awardable, and such other and further relief the Court deems equitable, just, or proper.  Plaintiffs demand trial by jury on all issues so triable.

## COUNT II – DEFENDANTS' VIOLATIONS OF ADA RIGHTS

Paragraphs 1 through 57 are realleged as if fully set forth herein, and it is further alleged that:

84.     Title 42, United States Code, Section 12131(1) defines "public entity," in pertinent part, as follows:  "(A) any State or local government; (B) any department, agency, special purpose

district, or other instrumentality of a State or States or local government … ." *Id.*  Title 42, United States Code, Section 12131(2) goes onto define "qualified individual with a disability" as follows: "… an individual with a disability who, with or without reasonable modifications or rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aides and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.*

85.    Title 42, United States Code, Section 12132 states that "[s]ubject to the provisions of this subchapter, no qualified individual with disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.*

86.    Title 42, United States Code, Section 12133 prescribes "Section 794a of title 29" for the "remedies, procedures, and rights [available under Section 12133] to any person alleging discrimination on the basis of disability in violation of Section 12132 of this title," *id.*, and, among other things, Title 29, United States Code, Section 794a provides for a fee shift.  *See* 29 U.S.C. § 794a(b).

87.    At all material times, Mr. Rebalko was (and still is) disabled as defined by the ADA. He meets the ADA criteria for disability because he suffers from both physical and mental impairments that substantially limit one or more major life activities, he has a history or record of such an impairment, and is a person who is perceived by others as having such an impairment.  At all material times, Mrs. Rebalko has a known relationship or association with her disabled husband, a relationship the Defendants (and each of them) were of actual knowledge at the time of his arrest or became aware of shortly after Mr. Rebalko's arrest and well before his protracted incarceration began.

88.     At the time of arrest, Mrs. Rebalko made clear to the Defendants that she was associated with and married to Mr. Rebalko as she advocated for his release based upon his disability.  In fact, both Mr. and Mrs. Rebalko fully informed Coupe and Perez of Mr. Rebalko's cancer-related impairments and, in particularly, his highly relevant cervical rotation limitations. Coupe dismissively responded to this disability disclosure by capriciously challenging the merits of Mr. Rebalko's physical impairment claims.  Equally egregious is the fact that at his deposition, Coupe essentially testified that it was not his fault that Mr. Rebalko could not drive like normal people.  Similarly, Perez testified that it was his opinion that disabled people should not drive.  The officers' entrenched misinformed attitudes reflect that both Coupe and Perez essentially acted in defiance of Mr. Rebalko's disability status.  Accordingly, and sadly, given their respective attitudes it cannot be said that Mr. Rebalko's arrest was simply a matter of the officers mistaking Mr. Rebalko's disability for the perceived criminal conduct of not following Coupe's order.   Even more egregious is Coupe's mocking of Mr. Rebalko's disability status when informed of his medical history by expressly taking issue with his claimed status.

89.     At no time did Coupe or Perez afford Mr. Rebalko any ADA accommodation or impairment-related assistance although the need for their assistance was obvious based upon clear observation, as well as Mr. Rebalko's express request for assistance.  Rather it appears that both officers vested with the attitude that disabled people can be denied such basic privileges as driving simply because they should either drive like normal people or not drive at all.   Mr. Rebalko's license stamped "safe driver" certainly belies these "concerns."  The fact that both officers were comfortable in making these shockingly callous remarks that were made in wholesale derogation of their fundamental ADA duties and responsibilities is undeniable testament to their outrageous lack of City training in this vital area of public responsibility and proper law enforcement conduct.

90.     In the end, Mr. Rebalko's disability rendered him unable to safely turn onto Wiles Road, as Coupe commanded.   Mr. Rebalko asked Coupe to accommodate his disability by assisting him, which would have permitted him to turn safely onto the highway *as both Mr. Rebalko and Coupe wanted*.  The accommodation could have been easily accomplished by Coupe – all he had to do was momentarily stop traffic or simply move his car from the intersection and park it a few feet away on the side of the road.  Coupe's inaction and denial of the public benefit of traffic assistance (particularly onerous here, as Coupe and Perez are solely responsible for Mr. Rebalko's need for assistance in the first place) also denied him the benefit of being able to turn onto Wiles Road, which, if accomplished, would have spared him the nightmare of being unlawfully arrested and incarcerated and prosecuted.

91.     Upon becoming aware of the circumstances, Perez also could have offered assistance, but he also chose to be dismissive of Mr. Rebalko's accommodation needs.

92.     Both Coupe and Perez have no real ADA training or knowledge.  Considering the high rank of both officers, it is plausible that this lack of training and knowledge is widespread throughout the CCSPD and throughout the City among personnel both in and out of the CCSPD.

93.     Pursuant to Title 42, United States Code, Section 12181(7) and Title 28, Code of Federal Regulations, Section 36.104, CCSPD is a governmental / public service agency and is covered by the ADA, which must be in compliance with the terms of the ADA.

94.     Pursuant to Title II of the ADA, each state and local government (and each agency of such a government) is obligated to evaluate its current services, policies, practices, and their effects that do not (or may not) meet the requirements of Title II of the ADA, and, if modification of service, policies, and practices is needed to achieve compliance, make the necessary modifications.

95.     To assure compliance with the ADA, local and state governments and / or related agencies should conduct training of their employees.  In that way, each state and locality (and each instrumentality of such a state or locality) can assure that individuals with disabilities are provided services in a manner that complies with the ADA.

96.     These facts render it obvious that the CCSPD did not have appropriate training for its officers in how to interact with and provide services to a disabled senior citizen.  These facts further suggest that this lack of training probably spreads well beyond the CCSPD by extending to City personnel in general.

97.     The failure of CCSPD to properly train Coupe and Perez in how to interact with and provide services to a disabled individual violated Title II of the ADA.

98.     CCSPD has discriminated against Mr. Rebalko by denying access to and full and equal enjoyment of the services, facilities, privileges, and advantages of its services provided, as prohibited by Title 42, United States Code, Section 12182, *et seq.*, by failing to have its officers properly trained to assist (and actually assist) individuals with disabilities as required by Title 42, United States Code, Section 12183.  Their discrimination likewise extends to Mrs. Rebalko, an associated person.

99.     CCSPD's violation of Title II of the ADA proximately caused the injuries sustained by Mr. Rebalko, that is his unlawful arrest and all damages and losses sustained by both Mr. and Mrs. Rebalko as a result thereof.

100.    Mr. Rebalko has no other adequate remedy other than this lawsuit to address the harm he has suffered (and continues to suffer) as a result of the deprivation of his federally protected rights.

101.    As a further result of the violation of Mr. Rebalko's ADA rights, Mr. Rebalko was required to retain counsel in his previous criminal case and both Plaintiffs have been required to retain legal counsel to represent them before this Court.  Accordingly, Plaintiffs seek recovery of their attorney's fees, expert expense, and costs pursuant to Title 42, United States Code, Sections 12205 and 12117 and Title 42, United States Code, Section 12133 (incorporating Title 29, United States Code, Section 794a(b).

102.    Pursuant to Title 42, United States Code, Section 12188(a), this Court is provided authority to grant relief considered to be appropriate, including injunctive relief such as an order compelling CCSPD to properly train its deputies so that they can understand and properly assist with the needs of those individuals with disabilities to the extent required by the ADA.

WHEREFORE, Plaintiffs respectfully request that this Court (a) issue a permanent injunction enjoining CCSPD from continuing their discriminatory practices, ordering CCSPD to properly train its employees and officers to serve and protect and assist individuals with disabilities to the extent required by the ADA, (b) award monetary damages that the Court deems equitable, just, or proper, (c) award fees, expert expense, and costs pursuant to Title 42, United States Code, Sections 12205 and 12117 and Title 42, United States Code, Section 12133 (incorporating Title 29, United States Code, Section 794a(b) or are as otherwise awardable / taxable, and (d) afford any such other relief the Court deems equitable, just, or proper.  Plaintiffs demand trial by jury on all issues so triable.

## COUNT III – DEFENDANTS' BREACH OF DUTY / NEGLIGENCE

Paragraphs 1 through 57 are realleged as if fully set forth herein, and it is further alleged that:

103.    Per the Florida Supreme Court:

> Four elements are necessary to sustain a negligence claim:  (1) a duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks; (2) a failure on the defendant's part to conform to the standard required:  a breach of the duty; (3) a reasonably close causal connection between the conduct and the resulting injury, [which] is commonly known as 'legal cause,' or 'proximate cause,' and which includes the notion of cause in fact; and (4) actual loss or damage.

*Curd v. Mosaic Fertilizer, LLC*, 39 So.3d 1216 (Fla. 2010).

104.    On March 4, 2015, Mr. Rebalko attempted to drive out of his neighborhood by traversing the Godfrey Road (a designated private road) / Wiles Road intersection, with Wiles Road being the only access point leading to and from his neighborhood.

105.    At this sole neighborhood access intersection, Coupe and Perez created a safety hazard by leaving their unmarked police SUV within the intersection while Mr. Rebalko was attempting to navigate through the intersection.

106.    Florida's Rescue Doctrine,[3] created a special relationship between Coupe / Perez and Mr. Rebalko, imposing a duty / legal obligation on Coupe / Perez to assist and rescue Mr. Rebalko from the traffic safety hazard that they had created.

107.    Mr. Rebalko's rescue from this danger could have been effectuated by either officer simply momentarily halting traffic on Wiles Road or by moving their SUV literally a few feet to clear the intersection.  Neither action, under any reasonable and law-abiding police officer standard, would have been unduly burdensome time-wise or effort-wise (directing traffic is a commonplace ministerial law enforcement function).  Moreover, the CCSPD has promulgated

---

[3] Under the common law Rescue Doctrine, Person 'A' is legally obligated to rescue Person 'B' when Person 'A' creates a hazardous situation that places Person 'B' in peril.  The Rescue Doctrine is the established law of our state that has been cited many times by our appellate courts.  More recently *see, e.g., Menendez v. W. Gables Rehab. Hosp.*, LLC, 123 So. 3d 1178 (Fla 3d DCA 2013); *Reeves v. North Broward Hospital*, 821 So. 2d 319 (Fla 4th DCA 2002); *New Hampshire Insurance Company v. Oliver*, 730 So. 2d 700 (Fla 4th DCA 1999); *Zwinge v. Hettinger*, 530 So. 2d 318 (Fla 2d DCA 1988).

regulatory provisions prohibiting their officers from leaving their vehicles parked in or around intersections. This adopted standard of conduct was likewise breached by Coupe and Perez.

108.    The operational decisions and refusal of Coupe and Perez to not assist Mr. Rebalko in a hazardous situation (that they created) was a breach of their legally obligated duty to rescue and a breach of the standard of care imposed by their own departmental rules and regulations.

109.    Even with knowledge of Mr. Rebalko's need for assistance, the officers insisted that Mr. Rebalko put himself in harm's way by ordering him to (blindly) enter the intersection. That conduct ascribes both negligent and intentional attributes to the conduct of both officers.

110.    Even under the generic reasonable man standard, Coupe's and Perez's conduct breached their duty as public safety officers to use reasonable care in the extrication of Mr. Rebalko from this danger.

111.    At all material times, Coupe and Perez were acting within their course and scope of employment with the City and the CCSPD.

112.    As a proximate result of the conduct of Coupe's and Perez's failure and or refusal to come to Mr. Rebalko's aid and rescue, he was arrested and incarcerated causing both Plaintiffs great pain and suffering as well as such other compensatory damages.

113.    CCSPD was derelict in their duty to educate, train, supervise Coupe and Perez in the public responsibilities of this doctrine, as well as the ancillary Police Public Service Doctrine. As a proximate result of CCSPD'S training negligence (nonfeasance, misfeasance, malfeasance), Coupe and Perez did not rescue Mr. Rebalko from the hazard they created, which led to the unlawful arrest and incarceration and prosecution of Mr. Rebalko, proximately resulting in his sustaining compensatory damages.

114.    Mr. Rebalko has no other adequate remedy other than this lawsuit to address the harm he has suffered (and continues to suffer) as a result of Defendants' breach of duty / negligence.

115.    As a further result of Defendants' breach of duty / negligence, Mr. Rebalko was required to retain counsel for representation in this matter.

WHEREFORE, Plaintiffs respectfully request the entry of judgment against these Defendants for compensatory damages, any awardable attorneys' fees, costs, and such other relief the Court deems equitable, just, or proper.  Plaintiffs demand trial by jury on all issues so triable.

## COUNT IV – DEFENDANTS' INTENTIONAL OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Paragraphs 1 through 57 are realleged as if fully set forth herein, and it is further alleged that:

116.    An intentional infliction of emotional distress cause of action is predicated on the following legal standard:  "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, such bodily harm."  *Eastern Airlines, Inc. v. King*, 557 So. 2d 574, 575 (Fla. 1990).

117.    The alternative negligent infliction of emotional distress cause of action is predicated on the following legal standard:

> In Florida, the prerequisites for recovery for negligent infliction of emotional distress differ depending on whether the plaintiff has or has not suffered a physical impact from an external force.  If the plaintiff has suffered an impact, Florida courts permit recovery for emotional distress stemming from the incident during which the impact occurred, and not merely the impact itself.  If, however, the plaintiff has not suffered an impact, the complained-of mental distress must be 'manifested by physical injury,' the plaintiff must be 'involved' in the incident by seeing, hearing, or arriving on the scene as the traumatizing event occurs, and the plaintiff must

> suffer the complained-of mental distress and accompanying physical impairment 'within a short time' of the incident.

*Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007) (internal citations omitted). Moreover, the Florida Supreme Court in *Willis* held as follow: "The essence of impact, then, it seems, is that the outside force or substance, no matter how large or small, visible or invisible, and no matter that the effects are not immediately deleterious, touch or enter into the plaintiff's body." *Id.* (internal citation omitted).

118.     At all times material COUPE and PEREZ were acting within the scope of their employment with the CITY and the CCSPD.

119.     The actions of Coupe and Perez described herein constitute extreme and outrageous conduct beyond all bounds of decency so as to be deemed utterly intolerable in a civilized community.

120.     This outrageous conduct then extended to supervisory level personnel who after being apprised of the circumstances literally kowtowed to both the conduct of Coupe and Perez (after having full knowledge of the circumstances) and kowtowed to the malicious and outrageous insistence of Coupe that Mr. Rebalko not be released under a notice to appear although with full knowledge of Mr. Rebalko's qualifying for a notice to appear release.   These supervisors outrageously claimed that it was their personal policy and departmental policy that the arresting officer (or person with the probable least objectivity) make that call.

121.     Coupe's shout down of Mrs. Rebalko (as more fully described above) was fully witnessed by Perez who did nothing to intervene.   In that sense, Perez acted as an accessory to Coupe's outrageous conduct.   This shout down occurred within the context of a power relationship that advantaged Coupe over Mrs. Rebalko, with Mrs. Rebalko all the while extra bewildered and distressed by Coupe's seeming instability (*e.g.*, noting to Mrs. Rebalko on the one hand that her

husband had not threatened him while on the other hand threatening that he was poised or tempted to taser her husband).  By observation alone, Mrs. Rebalko would appear powerless to Coupe given her small stature and advanced years compared to Coupe, and given the fact that Coupe was in police gear and was weaponized (like with a taser) unlike Mrs. Rebalko.  Mrs. Rebalko did nothing to incite Coupe's verbal assault of her.  During the course of this assault, Mrs. Rebalko stood on her property, which such property status alone should have allowed her some measure of respect from Coupe and Perez who at the time were mere interlopers upon this private road.

122.    As for Mr. Rebalko, there can be no doubt that his arrest and incarceration was intended by both Coupe and Perez to impose as much infliction of mental distress as possible, with full knowledge of his advanced years and disabilities.

123.    CCSPD, Coupe, and Perez intentionally or recklessly (or negligently, in the alternative) intended to cause both Plaintiffs to suffer severe emotional distress or engaged in the conduct with reckless disregard of the high probability of causing Plaintiffs to suffer emotional distress.

124.    As a proximate result thereof, Mrs. Rebalko lost employment for months and Mr. Rebalko suffered the pain, discomfort, embarrassment, and humiliation of jail and the enduring consequence of his mug shot being plastered all over the internet.

125.    In the alternative (negligent infliction of emotional distress), CCSPD, Coupe, and Perez owed Plaintiffs a duty to act with reasonable care and the injury to them was reasonably foreseeable and grave.

126.    CCSPD, Coupe, and Perez had the power, ability, authority, and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

127.    Plaintiffs have sustained pain and suffering as a proximate result thereof, as well as compensatory damages.

128.    Plaintiffs have no other adequate remedy other than this lawsuit to address the harm they have suffered (and continue to suffer) as a result of Defendants' infliction of emotional distress.

129.    As a further result of Defendants' infliction of emotional distress, Plaintiffs were required to retain counsel for representation in this matter.

WHEREFORE, Plaintiffs respectfully request the entry of judgment against the Defendants for an award of compensatory and punitive damages as permitted under the law, any awardable attorneys' fees, costs, and such other relief the Court deems equitable, just, or proper. Plaintiffs demand trial by jury on all issues so triable.

## COUNT V – MR. REBALKO'S FALSE ARREST (IMPRISONMENT) / BATTERY CLAIM AGAINST DEFENDANTS

Paragraphs 1 through 57 are realleged as if fully set forth herein, and it is further alleged that:

130.    "To state a common-law claim for false arrest under Florida law, Plaintiff must demonstrate that he was unlawfully restrained, without legal authority, against his will." *Hayden* at 17 (citing, *inter alia*, *Willingham v. CITY of Orlando*, 929 So. 2d 43, 48 (Fla. 5th DCA 2006)). "A warrantless arrest without probable cause is unlawful." *Id.* (citing *Case v. Eslinger*, 555 F.3d 1317, 1326-1327 (11th Cir. 2009)). "In Florida, common-law 'false arrest' and 'false imprisonment' are different labels for the same cause of action." *Id.* at n. 6 (citing, *inter alia*, *Rankin v. Evans*, 133 F.3d 1425, 1430 n. 5 (11th Cir. 1998)).

131.    As more fully described above, through their direct actions, Coupe and / or Perez personally participated in and caused the false arrest and false imprisonment of Mr. Rebalko while

acting under color of law and the indicia of legal power, but without any lawful authority to do so. Mr. Rebalko's arrest / imprisonment was effectuated without probable cause and without a warrant.

132.    Coupe's and Perez's restraint of Mr. Rebalko was entirely unlawful and nonconsensual.

133.    The battery upon Mr. Rebalko consisted of his being restrained, manhandled, confined, and moved to various intimidating and / or horrid locations around Broward County all against his will and consent.  Further, Coupe forcefully shoved Mr. Rebalko to the ground simply because he could.

134.    At all material times, Coupe and Perez were acting within the course and scope of their employment with the City and the CCSPD

135.    As a direct and proximate result of Coupe's and Perez's wrongful acts (none of which were corrected or mitigated at any juncture by CCSPD even though they were in a position to do so), Mr. Rebalko suffered a protracted loss of liberty and freedom, mental and emotional distress, impairment of reputation, and personal humiliation.  These losses are either permanent or continuing in nature.

136.    Mr. Rebalko has no other adequate remedy other than this lawsuit to address the harm he has suffered (and continue to suffer) as a result of Defendants' false arrest / imprisonment.

137.    As a further result of Defendants' false arrest / imprisonment, Mr. Rebalko was required to retain counsel for representation in this matter.

WHEREFORE, Plaintiff, Lee Rebalko, respectfully requests the entry of judgment against the Defendants for an award of compensatory and punitive damages as permitted under the law,

any awardable attorneys' fees, costs, and such other relief the Court deems equitable, just, or proper.  Mr. Rebalko demands trial by jury on all issues so triable.

### COUNT VI – MR. REBALKO'S MALCIOUS PROSECUTION CLAIM AGAINST DEFENDANTS

Paragraphs 1 through 57 are realleged as if fully set forth herein, and it is further alleged that:

138.    Per this Court in *Hayden*:

Under Florida law, a plaintiff must establish six elements to support a claim of malicious prosecution:   (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding.

*Id.* at 19 (citing, *inter alia*, *Kingsland v. CITY of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004)).

139.    Coupe and Perez wrongfully caused criminal proceedings to be instituted against Mr. Rebalko with malice and the absence of probable cause, or arguable probable cause, by submitting falsified cover-up police reports to prosecuting authorities.  These police reports were not only ratified by CCSPD and the City, but both the CCSPD and the City later acted to bolster the credibility of the officers' reports and testimonies after their reports and testimonies were called into question by the SAO.

140.    More specifically, over a period of days, Coupe authored a total of four separate reports totaling nine pages for this single count misdemeanor (an extraordinary length for a minor count).  Coupe's partner (Perez) also contributed paperwork.   In these reports, Coupe falsely reported that the arrest occurred within his municipality of City, rather than where it actually occurred, outside his municipality in the City of Parkland.  This false representation was made to

"legitimize" an unlawful out-of-jurisdiction arrest, with the eventual goal of securing a fraudulent conviction. An unlawful arrest vitiates any notion of the existence of probable cause, as probable cause is only a prequel to an act of lawful police conduct.

141.    Coupe and Perez acted with malice when offering false statements and reports with the intent that false charges be filed against Mr. Rebalko. This maliciously intended to cover-up their own unlawful misconduct by arresting Mr. Rebalko.

142.    The malicious acts of Coupe and Perez were later exacerbated by the complicitous malicious conduct of the City and CCSPD by contacting the prosecuting authorities and urging the prosecution of Mr. Rebalko after they learned that the officers falsified cover-up stories and reports had fallen apart. Following the misguided efforts of the City and CCSPD to gain the prosecution of Mr. Rebalko, charges were filed against him and protracted prosecution ensued.

143.    The criminal prosecution against Mr. Rebalko concluded in his favor as eventually all charges were dismissed.

144.    As a proximate result of the malicious and false charges asserted against him by both the named and unnamed Defendants joined hereunder, Mr. Rebalko suffered the embarrassment and humiliation of having to defend himself in a public record, was forced to retain and pay for criminal defense attorney, suffered public disgrace, and endured some twenty-seven months of mental stress and anxiety during the process.

145.    Mr. Rebalko has no other adequate remedy other than this lawsuit to address the harm he has suffered (and continue to suffer) as a result of Defendants' malicious prosecution.

146.    As a further result of Defendants' malicious, Mr. Rebalko was required to retain counsel for representation in this matter.

WHEREFORE, Plaintiff, Lee Rebalko, respectfully requests the entry of judgment against the Defendants for an award of compensatory and punitive damages as permitted under the law, any awardable attorneys' fees, costs, and such other relief the Court deems equitable, just, or proper.  Mr. Rebalko demands trial by jury on all issues so triable.

## COUNT VII – DEFENDANTS' TRESPASS

Paragraphs 1 through 57 are realleged as if fully set forth herein, and it is further alleged that:

147.    At all material times, Plaintiffs were joint owners of a private road (Godfrey Road) located within the City of Parkland with the right to exclude persons from trespassing on their private road.  At the top of Godfrey Road are two large and prominent signs displaying the road's status as a private road.

148.    On March 4, 2015, Coupe and Perez entered upon Plaintiffs' private road and property on an unauthorized basis and, while there, engaged in unauthorized, unlawful, and dangerous activities all without the Plaintiffs' permission and initial knowledge.

149.    This private property intrusion was against Plaintiffs' best interests and interfered with Plaintiffs' lawful and quiet enjoyment of their property.  Eventually this trespass led to Plaintiff, Mr. Rebalko's dispossession from his own property at the hands of said Defendants.

150.    This trespass was preceded by a number of past trespasses committed by the City accompanied by warnings for Defendants to cease their trespassing activities and operations.

151.    Plaintiffs have no other adequate remedy other than this lawsuit to address the harm they have suffered (and continue to suffer) as a result of Defendants' trespass.

152.    As a further result of Defendants' trespass, Plaintiffs were required to retain counsel for representation in this matter.

WHEREFORE, Plaintiffs respectfully requests the entry of judgment against the Defendants for an award of compensatory and punitive damages as permitted under the law, any awardable attorneys' fees, costs, and such other relief the Court deems equitable, just, or proper. Plaintiffs demand trial by jury on all issues so triable.

## COUNT VIII – PLAINTIFFS' EQUITABLE INDEMNITY CLAIM FOR RECOVEYR OF ATTORNEYS' FEES AND COSTS EXPENDED IN THE CASE OF *STATE VS. REBALKO*, BROWARD COUNTY CASE NO. 15-2647MM10A

Paragraphs 1 through 57 are realleged as if fully set forth herein, and it is further alleged that:

153.    As a proximate result of the wrongful conduct of all Defendants named herein, Plaintiffs were required to retain criminal defense counsel and they expended in excess of $10,000.00 in the criminal defense of the criminal charges filed against Mr. Rebalko by the State of Florida.

154.    But for the Defendants' wrongful conduct, Plaintiffs would not have incurred the fees and costs necessitated by this prosecution.  But for the expenditure of said fees and costs, Mr. Rebalko would not have prevailed in the criminal prosecution against him.

155.    The fees and costs claimed hereunder were abundantly fair and reasonable.

156.    Plaintiffs have no other adequate remedy other than this lawsuit to address the harm they have suffered (and continue to suffer) as a result of the monies they had to expend defending Mr. Rebalko.

157.    As a further result of the monies Plaintiffs' had to expend defending Mr. Rebalko in the underlying criminal action, Plaintiffs were required to retain counsel for representation in this matter.

WHEREFORE, Plaintiffs respectfully request the entry of judgment against the Defendants for an award of compensatory damages, any awardable attorneys' fees, costs, and such other relief the Court deems equitable, just, or proper.  Plaintiffs demand trial by jury on all issues so triable.

## COUNT IX – THE CITY'S AND FLC'S FOR VIOLATION OF SECTION 627.4137 OF THE FLORIDA STATUTES

Paragraphs 1 through 57 are realleged as if fully set forth herein, and it is further alleged that:

158.    Section 627.4137(1) of the Florida Statutes provides, in pertinent part, as follows: "Each insurer which does or may provide liability insurance coverage to pay all or a portion of any claim which might be made *shall* provide, within 30 days of the written request of the claimant … (e) A copy of the policy."  *Id.* (emphasis added).  Section 627.4137(1) further provides, in pertinent part, as follows:  "In addition, the insured … upon written request of the claimant or the claimant's attorney, *shall* disclose the name and coverage of each known insurer to the claimant … ."  *Id.* (emphasis added).

159.    By letter dated October 25, 2018, to the City, undersigned counsel, on behalf of Plaintiffs, served the City with a Section 627.4137 informational request.  Although the City had a non-discretionary legal responsibility to comply with Section 627.4137(1) ("shall disclose the name and coverage of each known insurer to the claimant …"), it never responded to Plaintiffs' October 25, 2018, letter.  By letter dated November 30, 2018, undersigned counsel followed-up with the City regarding the October 25, 2018, letter, even enclosing the October 25, 2018, letter for the City's ease of reference.  Again the City failed / refused to respond in continued violation of Section 627.4137(1).  By email letter dated December 18, 2018, undersigned counsel followed-

up with the City again regarding the Section 627.4137 request. This correspondence was likewise not acted upon by the City in continued violation of Section 627.4137(1).

160. Ultimately, undersigned counsel received a form initial contact type letter from an FLC adjuster that essentially ignored Plaintiffs' informational requests in favor of inquiring of Plaintiffs information pertinent to an irrelevant motor vehicle type case / claim. This left Plaintiffs still without both the subject insurance policies or any functionally equivalent documents and without any response to their specific policy inquiries.

161. Then, by a letter dated January 8, 2019, undersigned counsel pointed out (among other things) the statutory deficiencies of the FLC's December 10, 2018, letter and reiterated the Section 627.4137 request.

162. The FLC has not responded to this most recent request.

163. As of the date of this filing (approximately four months after making the initial Section 627.4137 request), the City still has not responded and the FLC has failed to provide the statutorily required (and quite important) documentation / information. The City's non-response and the FLC's haplessly inept response constitute violations of Section 627.4137 of the Florida Statutes.[4]

164. Plaintiffs have been harmed (and continue to suffer harm) as a result of the City's and FLC's violations of Section 627.4137 of the Florida Statutes. For example, the Section 627.4137 documentation / information could have revealed (and may still reveal) the identities of

---

[4] It is presently unclear (due to FLC's Section 627.4137 violations) what exactly FLC's duties / responsibilities are in relation to insuring the CITY and / or processing / investigating claims relating to the CITY. Depending on those duties / responsibilities (which will doubtless be learned as litigation and the discovery process unfold), FLC's conduct (or lack thereof) also potentially violates Sections 626.9541(1)(i)3.a and 3.c of the Florida Statutes, actionable under Section 624.155(1)(a)1 of the Florida Statutes or common law.

other defendants and insurers that certainly could impact and prejudice Plaintiffs' pleading allegations relative to all existing coverages; *i.e.*, Plaintiffs' overall legal strategies including which causes of action to advance (or not advance) and against which parties, *et cetera*.

165.    Plaintiffs have no other adequate remedy other than this lawsuit to address harm they have suffered (and continue to suffer) as a result of the City's and the FLC's violations of Section 627.4137 of the Florida Statutes.

166.    As a further result of the City's and the FLC's violations of Section 627.4137 of the Florida Statutes, Plaintiffs have been forced to retain legal counsel to represent them in this matter and are accordingly entitled to recover their reasonable attorney's fees and costs pursuant to Section 627.428 of the Florida Statutes[5] or as otherwise awardable.

WHEREFORE, Plaintiffs respectfully request the entry of and appropriate order and / or judgment to compel both the City and the FLC to comply with Section 627.4137 (as the City may have coverage additional to its policy with the FLC), including, but not limited to, Defendants immediate production of any and all insurance policies or similar type documentation, allowing Plaintiffs leave of court to amend their complaint even upon closure of the pleadings in relation to any new information learned from the Section 627.4137 mandatory disclosures, attorneys' fees and costs pursuant to Section 627.428 of the Florida Statutes, as a sanction, and / or as otherwise awardable, and such other relief as the Court deems equitable, just, or proper.

Dated:  March 4, 2019

---

[5] And / or Section 624.155(4) of the Florida Statutes depending on how facts unfold, *see* footnote 4, *supra*.

Respectfully submitted,

**CALLAGY LAW, P.C.**

*/s/ Jeffrey L. Greyber, Esq.*
**Jeffrey L. Greyber, Esq.**
Florida Bar No. 41103
**Ivan J. Tarasuk, Esq.**
Florida Bar No. 15774
1900 N.W. Corporate Blvd., Ste 310W
Boca Raton, Florida  33431
Telephone: (561) 405-7966
Facsimile: (201) 549-8753
jgreyber@callagylaw.com
hcasebolt@callagylaw.com
itarasuk@callagylaw.com
ecelicourt@callagylaw.com