**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-60569-CIV-ALTMAN/Hunt**

**LEE REBALKO**, *et al.*,

      *Plaintiffs*,

v.

**THE CITY OF CORAL SPRINGS**,
*et al.*,

      *Defendants*.

_____/

## ORDER

Before the Hon. Roy K. Altman:

Lee Rebalko, a 62-year-old cancer survivor, was turning out of his neighborhood onto a busy highway when he found himself blocked by an unmarked police SUV. Although the officer who had been driving that SUV saw Mr. Rebalko struggling to avoid the obstruction, he instructed Mr. Rebalko to turn (blindly) into oncoming traffic. When Mr. Rebalko alighted his vehicle to ask the officer for help—introducing himself as an attorney and then offering only "mild" criticism— the officer immediately arrested him and then, "for no reason," threw him aggressively to the ground. The officer (and his colleague) later fabricated their arrest reports to reflect the (now-discredited) narrative that the arrest had occurred *within* the officers' jurisdiction. Based on these falsified reports, the State Attorney's Office ("SAO") prosecuted Mr. Rebalko for two years— before the case was finally tossed as meritless.

These are Mr. Rebalko's central allegations—which, true or not, this Court must *accept* as true. On the back of these averments, Mr. and Mrs. Rebalko assert a gallimaufry of constitutional, statutory, and common-law claims against the officers and their employer, the City of Coral

1

Springs (collectively, the "Defendants"). The Defendants have now moved to dismiss. As set out below, some of the Rebalkos' claims will survive—and some will not.[1]

## THE FACTS[2]

Lee Rebalko ("Mr. Rebalko") and Ruth Evans Rebalko ("Mrs. Rebalko") (collectively, the "Rebalkos"), both in their sixties, have lived in the City of Parkland for some twenty-five years. *See* Compl. [ECF No. 51] ¶¶ 4–5. Mr. Rebalko, a head- and neck-cancer survivor, suffers from certain cognitive and physical deficits resulting from sustained doses of radiation and chemotherapy. *Id.* ¶¶ 241–42. These deficits include, for example, a decreased range of motion in his neck and substantially delayed reactions. *Id.* Mrs. Rebalko has been her husband's caregiver since he fell ill in 2007. *Id.* ¶ 12.

The Rebalkos have a long-standing feud with the City of Coral Springs (the "City")—a municipality adjacent to Parkland—over the City's use of their neighborhood's private roadway, Godfrey Road. *Id.* ¶ 165. The Rebalkos, along with their neighbors, own Godfrey Road, the sole means of access to their neighborhood. *Id.* ¶ 6. Godfrey Road is therefore designated as a private road. *Id.* ¶ 7. For over twenty years, Mr. Rebalko—a lawyer—has been both president and legal counsel for the road association that governs Godfrey Road. *Id.* ¶ 27. The Rebalkos allege that the subject of this suit—the City's decision to arrest and prosecute Mr. Rebalko—stems (in part) from "an ongoing course of contentious interactions between these parties over the City's contended misuse of Godfrey Road." *Id.* ¶ 165.

---

[1] The "Motion" refers to the Defendants' Motion to Dismiss [ECF No. 52] (the "Motion"), which ripened when the Rebalkos filed their Response [ECF No. 57] (the "Response"), and the Defendants submitted their Reply [ECF No. 61].

[2] The Court takes these "facts"—which, at this stage, we must accept as true—from the Rebalkos' Amended Complaint [ECF No. 51]. For ease of reference, the Court will refer to the operative Amended Complaint simply as "the Complaint."

2

Which brings us to the events that gave rise to this action. On March 4, 2015, two City police officers—Robert Coupe ("Officer Coupe") and Jesse Perez ("Officer Perez")[3]—were assigned to a retail-theft surveillance operation at a Target store located within the City's jurisdiction. *Id.* ¶ 18. At some point that day, however, the Officers stopped a vehicle on Godfrey Road in Parkland—*outside* their Coral Springs jurisdiction and "miles" away from the Target they had been surveilling—for a moving traffic violation. *Id.* ¶¶ 30, 212.

As the Officers approached the (now-stopped) vehicle, they detected the odor of burnt marijuana emanating from the car. *Id.* ¶ 32. This odor, in turn, triggered an extensive drug search that lasted nearly an hour. *Id.* ¶ 45. Although the search took place outside their jurisdiction, neither Officer attempted to secure authority to act in Parkland. *Id.* ¶ 44. During their hour-long drug search, the Officers parked their large, unmarked SUV at the intersection of Godfrey Road (a private street) and Wiles Road (a four-lane highway), blocking Godfrey Road's only access point and causing traffic to build up at the intersection—all in violation of the police department's rules. *Id.* ¶¶ 45–46, 52; *see also* Motion at 6.

As mentioned, the search had gone on for almost an hour by the time Mr. Rebalko approached the intersection. Compl. ¶ 48. By then, the Officers had secured the scene and cleared any viable threats. *Id.* ¶ 51. On reaching the intersection, Mr. Rebalko noticed the large police SUV and the traffic congestion it had caused. *Id.* ¶ 52. He came to a stop at the stop sign and tried to leave his neighborhood by turning onto the main highway. *Id.* ¶ 53. But Mr. Rebalko could not see through or around the police SUV, which was both much larger than his car and equipped with dark reflective windows. *Id.* ¶ 54.

As Mr. Rebalko strained to turn out onto the highway, Officer Coupe watched him struggle.

---

[3] Collectively, the "Officers."

3

*Id.* ¶ 55. Rather than help him, Officer Coupe repeatedly directed Mr. Rebalko to turn into oncoming traffic. *Id.* In response to these directives, Mr. Rebalko briefly expressed his safety concerns—that he could not see past the SUV and that he feared turning out onto the busy highway—and asked Officer Coupe to help him by momentarily halting traffic. *Id.* ¶¶ 56–57. Officer Coupe didn't respond. *Id.* ¶ 57.

So, Mr. Rebalko—who was boxed in by a car from behind and felt unsafe sitting idly at the busy intersection—stepped out of his car in the hopes of securing some help. *Id.* ¶ 61. To gain credibility, Mr. Rebalko introduced himself as an attorney. *Id.* ¶ 133. He then explained to Officer Coupe the hazardous situation he had found himself in and, in so doing, voiced only "mild criticism" of the Officers. *Id.* ¶ 62. While Mr. Rebalko's intrusion was minimal (indeed, the scene had long been secured, and Officer Perez, *not* Officer Coupe, was leading the search), *id.* ¶¶ 51, 118, 150, Officer Coupe's reaction was swift and severe, *id.* ¶ 134. He immediately responded: "Oh an attorney, hands behind your back." *Id.* ¶¶ 62, 134.

Officer Coupe placed Mr. Rebalko under arrest. *Id.* ¶ 62. As Officer Coupe was handcuffing him, Mr. Rebalko fully complied, did not attempt to flee, and did not resist in any way. *Id.* ¶¶ 64–66. And yet, even after Mr. Rebalko was fully secured, Officer Coupe aggressively and painfully jerked and dragged him by the handcuffs. *Id.* ¶ 67. He then—"for no reason at all"— shoved Mr. Rebalko to the ground. *Id.* ¶¶ 67, 298. Officer Coupe also threatened Mr. Rebalko, declaring that he was "poised" and "tempted" to deploy a taser on him. *Id.* ¶ 68.

A few minutes after Mr. Rebalko's arrest, Mrs. Rebalko arrived on the scene. *Id.* ¶ 73. Mrs. Rebalko asked Officer Coupe why her husband was being arrested. *Id.* In response, Officer Coupe admitted that Mr. Rebalko had not been aggressive towards him. *Id.* ¶ 75. Nevertheless, he (repeatedly) exclaimed that "[h]e is going to jail!" *Id.* ¶ 74. According to the Complaint, Officer

Coupe's tone was overbearing. *Id.* ¶ 78. With her husband now under arrest, Mrs. Rebalko—citing Mr. Rebalko's health issues—asked Officer Coupe to release him with a simple "notice to appear." *Id.* ¶ 76. Officer Coupe rejected this request. *Id.* ¶ 77. Notably, up to this point, there is no allegation that Officer Perez participated (in any way) in Mr. Rebalko's arrest. *Id.* ¶¶ 71, 80.

Mr. Rebalko was incarcerated for a few hours at the City's jail before he was transferred to Broward County's main jail, where he spent the night. *Id.* ¶¶ 89, 91, 94. During this time, he was stripped of his clothes, body searched, left in a cold cell, and chained to a group of prisoners. *Id.* ¶¶ 90, 92, 94. Although Mr. Rebalko never fell ill while in custody, *id.* ¶¶ 89–97, he and his wife were left distressed by his imprisonment, *id.* ¶¶ 95, 97.

Following the incident, the Officers orchestrated and carried out a scheme to cover up their jurisdictionally invalid arrest. *Id.* ¶ 82. First, the Officers dispensed with their original suspects by allowing them to go free with a mere traffic violation. *Id.* ¶ 83. Then, the Officers drafted a series of false arrest documents, which misrepresented the location of the stop as being *within*, as opposed to *beyond*, the City's jurisdictional limits. *Id.* ¶ 84.

The Officers submitted their falsified reports to the SAO with the intent of having formal charges filed against Mr. Rebalko. *Id.* ¶ 98. At the request of Mr. Rebalko's criminal defense counsel, the SAO did not take the reports at face value but (instead) conducted its own independent investigation of the arrest. *Id.* ¶ 99. Based on that investigation, the SAO found the Officers' account to be (in its words) "dubious" and determined that they lacked "the needed jurisdictional and legal authority to arrest Mr. Rebalko." *Id.* ¶¶ 100–01.

On learning of the SAO's decision, Mr. Rebalko delivered a standard statutory claim letter to the City—together with a complaint about the Officers' misuse of Godfrey Road. *Id.* ¶ 102. Thereafter, for reasons that are neither clear nor documented, the SAO reversed course and decided

to file a formal obstruction-of-justice charge against Mr. Rebalko. *Id.* ¶ 103. At this same time, the SAO's files note a conversation with Officer Coupe, in which the Officer claimed to have been deputized by Parkland—a claim that would have supplied the missing jurisdictional link for Mr. Rebalko's arrest. *Id.* ¶¶ 104–05. But, after prosecuting Mr. Rebalko for over two years, the SAO questioned Officer Coupe again and (this time) determined that, in fact, he was never so deputized. *Id.* ¶ 106. As a result, the SAO declined to contest Mr. Rebalko's motion to dismiss, which a state judge granted on June 30, 2017. *Id.* ¶¶ 107–08.

### THE LAW

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545).

On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). Unsupported factual allegations and legal conclusions, however, receive no such deference. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). A complaint's "well-pled allegations must 'nudge the claims across the line from conceivable to plausible.'" *Hays v. Page Perry, LLC*, 627 F. App'x 892, 896 (11th Cir. 2015) (cleaned up) (quoting *Twombly*, 550 U.S. at 555, 570).

## ANALYSIS

The Defendants have moved to dismiss all 27 counts of the Complaint. These counts can be divided into ten categories: (1) federal and state false-arrest, false-imprisonment, and malicious-prosecution claims against the Officers (Counts I, IV, XI, XII, XIV, and XV); (2) excessive-force and battery claims against Officer Coupe (Counts III and XIII); (3) a First Amendment retaliation claim against Officer Coupe (Count II); (4) a failure to intervene claim against Officer Perez (Count V); (5) an Equal Protection "class of one" claim against the City (Count VI); (6) *Monell* claims against the City (Counts VII and VIII); (7) Americans with Disabilities Act claims against the City (Counts IX and X); (8) trespass claims against the Officers (Counts XVI, XVII, XVIII, and XIX); (9) invasion-of-privacy claims against the Officers (Counts XX, XXI, XXII, and XXIII); and (10) loss-of-consortium claims against the Officers (Counts XXIV, XXV, XXVI, and XXVII). The Court considers each of these claim categories in turn.

### I.  Category 1: False Arrest, False Imprisonment, and Malicious Prosecution (Counts I, IV, XI, XII, XIV, and XV)

The Rebalkos' false-arrest, false-imprisonment, and malicious-prosecution claims raise two issues: *First*, are the Officers entitled to qualified immunity? *Second*, did the Officers have

probable cause to arrest Mr. Rebalko? In short, the answer to both questions—at least on the facts alleged in the Complaint—is no. As to the *first*, the Complaint has plausibly asserted that the Officers are not entitled to qualified immunity because they acted outside their jurisdiction—and thus beyond their lawful discretion. As to the *second*, the Complaint has plausibly alleged that the Officers lacked probable cause because, if the Complaint's averments are true, no reasonable officer would believe that Mr. Rebalko committed a crime when he stopped his car to avoid oncoming traffic and briefly asked the Officers for help. The Court explains each of these conclusions below.

### A.      Qualified Immunity

Because (on the facts alleged) the Officers were acting *outside* their jurisdiction—where they lacked any lawful authority—they are not entitled to qualified immunity. "Qualified immunity offers 'complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (quoting *Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001)). The purpose of qualified immunity is to allow government officials to *do their jobs* "without the fear of personal liability or harassing litigation." *Id.* at 1194.

Thus, "to receive qualified immunity, an official must first establish that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266–67 (11th Cir. 2004) (noting that, to qualify for the immunity, officials must be "exercising powers that legitimately form a part of their jobs"). To do this, an officer must show that his actions were "(1) undertaken pursuant to the performance of his duties,

and (2) within the scope of his authority." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998).

The Eleventh Circuit has counseled district courts to "look to state law to determine the scope of a state official's discretionary authority." *Estate of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 2746 (2019). Under Florida law, with limited exceptions, "municipal law enforcement officers can exercise their law enforcement powers only within the territorial limits of the municipality." *Knight v. State*, 154 So. 3d 1157, 1159 (Fla. 1st DCA 2014); *see also Jones v. State*, 279 So. 3d 342, 345 (Fla. 5th DCA 2019) ("Generally speaking, a county or municipal police officer has no official authority to arrest an offender outside the boundaries of the officer's county or municipality."); *State v. Sobrino*, 587 So. 2d 1347, 1348 (Fla. 3d DCA 1991) (noting that, in general, "a police officer has no power to effect a 'stop' outside of his territorial jurisdiction").[4] Here, the Officers stopped a car *outside* their jurisdiction, searched a car *outside* their jurisdiction, and arrested Mr. Rebalko *outside* their jurisdiction. The Officers thus exceeded the scope of their authority and are *not* entitled to qualified immunity. *See, e.g.*, *Lenz v. Winburn*, 51 F.3d 1540, 1547 (11th Cir. 1995) ("Because [the defendant] acted outside the scope of her authority, she is not entitled to qualified immunity.").

There are, to be sure, four exceptions to this general principle that officers may not act outside their jurisdiction. But none applies here.

*First*, "[a]ny duly authorized state, county, or municipal arresting officer is authorized to arrest a person outside the officer's jurisdiction when in fresh pursuit." FLA. STAT. § 901.25. Under this "fresh pursuit" exception, "an officer is allowed to pursue a fleeing suspect, even though the

---

[4] Indeed, Florida courts have recognized that, because "[t]he powers wielded by police officers are vast, and subject to abuse . . . , such power has been restricted by strict construction, limited exceptions, and harsh remedies for violations of police powers." *Sobrino*, 587 So. 2d at 1348.

9

suspect crosses jurisdictional lines, provided that the officer had legally sufficient grounds to detain or arrest the suspect before he or she left the jurisdiction." *Jones*, 279 So. 3d at 345. Fresh pursuit requires: "1) that the police act without unnecessary delay; 2) that the pursuit be continuous and uninterrupted; and 3) that there be a close temporal relationship between the commission of the offense and the commencement of the pursuit and apprehension of the suspect." *State v. Gelin*, 844 So. 2d 659, 661 (Fla. 3d DCA 2003) (quoting *Porter v. State*, 765 So. 2d 76, 80 (Fla. 4th DCA 2000)).

Although it is admittedly a (very) close call, the "fresh pursuit" exception does not apply in the circumstances presented here—at least if the Complaint's allegations are taken as true. As an initial matter, the Rebalkos allege that the third-party vehicle was stopped *in Parkland*, and that, in the days after Mr. Rebalko's arrest, the Officers engaged in an extensive scheme to "cover up" a jurisdictionally flawed arrest—including (1) by lying about where the stop occurred and (2) by falsely claiming (as Officer Coupe allegedly did) to have been deputized by the Parkland Police Department. Compl. ¶¶ 30, 82, 84, 104. On these allegations—viewed, of course, in the light most favorable to the Rebalkos—the Complaint plausibly alleges that the Officers lied precisely because they knew they were outside their jurisdiction throughout their encounter with the third-party vehicle. Moreover, the Rebalkos aver that the third-party vehicle's moving violation occurred "miles away" from where the Officers finally decided to stop it. *Id.* ¶ 30. From this allegation, one could reasonably infer that the Officers failed to act without "unnecessary delay"—and, thus, that their pursuit was not, in fact, "fresh." *Cf. Bailey v. Wheeler*, 843 F.3d 473, 482 (11th Cir. 2016) ("[A] court reviewing a motion to dismiss must draw all reasonable inferences from the factual allegations in a plaintiff's complaint in the plaintiff's favor.").

Now, of course, discovery may show that none—or only some—of these things are true.

10

But, at this (preliminary) phase of the case, the Court is not permitted to weigh the evidence or to entertain facts that lie somewhere beyond the four corners of the Complaint. *See, e.g.*, *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) ("A court's review on a motion to dismiss is 'limited to the four corners of the complaint.'" (quoting *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir. 2002))). And so, drawing only from the Complaint's averments, the "fresh pursuit" exception does not apply here.

*Second*, an officer "may conduct investigations beyond the [department's] municipal limits." *State v. Allen*, 790 So. 2d 1122, 1125 (Fla. 2d DCA 2001). But Florida's courts have narrowed this investigative authority in two ways. The first limitation is that the "subject matter of the investigation [must] originate[] inside the city limits." *Id.*; *see also State v. Chapman*, 376 So. 2d 262, 264 (Fla. 3d DCA 1979) ("A municipal officer may conduct a lawful investigation outside his territorial jurisdiction, . . . but the subject matter of the investigation must have originated in his own jurisdiction."). The second limitation is that, in conducting an extra-territorial investigation, officers "may investigate and gather evidence only through the use of their own senses and through the voluntary cooperation of citizens; they may not employ the power or color of their office either expressly or by implication in order to gather evidence or ferret out criminal activity not otherwise observable." *State v. Sills*, 852 So. 2d 390, 394 (Fla. 4th DCA 2003) (quoting *State v. Phoenix*, 428 So. 2d 262, 266 n.2 (Fla. 4th DCA 1982), *approved*, 455 So. 2d 1024 (Fla. 1984)).

Here, on the facts alleged, the Officers were *not* engaged in a lawful extra-jurisdictional investigation when they arrested Mr. Rebalko. As to the first limit on such investigations, the Rebalkos have plausibly alleged that the "subject matter" of the Officers' investigation into the third-party vehicle—first for a traffic violation and then for marijuana possession—originated

*outside* the City's limits. Compl. ¶¶ 30, 32, 43, 82, 84, 104. The Complaint never alleges—as an example—that the Officers were investigating a crime within their jurisdiction (say, drug possession), which then led them to question witnesses or suspects outside their jurisdiction. *See Sills*, 852 So. 2d at 393 (holding that an extra-jurisdictional drug search was improper (partly) because "the defendant's possession of the substance . . . was never in [the officers'] jurisdiction"); *see also Parker v. State*, 362 So. 2d 1033, 1033 (Fla. 1st DCA 1978) (holding that an officer investigating the "sale of stolen property within the city" could interrogate people outside of the city).

With respect to the second limit on extra-jurisdictional investigations, the Defendants have pointed to no case in which a Florida court has used the "authorized investigation" exception to allow a *compulsory* drug search that occurred outside the officers' jurisdiction. In fact, Florida courts have suggested the opposite: that compulsory searches are *precisely* the kind of police action—taken "under color of the office"—that cannot be conducted outside the officers' jurisdiction. *See, e.g.*, *State v. Stouffer*, 248 So. 3d 1165, 1168 (Fla. 4th DCA 2018) ("[T]he statutes that govern the execution of a search warrant provide that only law enforcement officers may execute a search warrant."); *Mattos v. State*, 199 So. 3d 416, 419–21 (Fla. 4th DCA 2016) (finding an extra-jurisdictional investigation unlawful because the officer "attempted to have [the suspect] submit to a breathalyzer and perform field sobriety exercises," thereby obtaining "evidence only available to him in his capacity of a law enforcement officer"); *Sills*, 852 So. 2d at 393 (finding that even a *consensual* drug search exceeded investigative authority); *cf. Phoenix v. State*, 455 So. 2d 1024, 1025 (Fla. 1984) (noting that officers may not use the "powers of their office to observe unlawful activity or gain access to evidence not available to a private citizen").

*Third*, Florida courts have held that "police officers outside their jurisdictional territory

may make an arrest as private persons where a private person could lawfully make an arrest." *Collins v. State*, 143 So. 2d 700, 703 (Fla. 2d DCA 1962). Setting out the circumstances in which a private person may effectuate this sort of "citizen's arrest," the Florida Supreme Court has said: "A private citizen does have the common law right to arrest a person who commits a felony in his presence, or to arrest a person where a felony has been committed, and where the arresting citizen has probable cause to believe, and does believe, the person arrested to be guilty." *Phoenix*, 455 So. 2d at 1025 (quoting *Collins*, 143 So. 2d at 703).

Here, neither the Officers' stop of the third-party vehicle nor their arrest of Mr. Rebalko falls within this citizen's-arrest exception. Indeed, the Officers stopped the third-party vehicle—outside their jurisdiction—based on a *traffic* violation, which is not a felony and thus cannot supply the basis for a citizen's arrest. Even the Officers concede that Mr. Rebalko committed nothing more than a "noncriminal traffic infraction," FLA. STAT. § 316.1945, coupled with a "misdemeanor" for resisting an officer, FLA. STAT. § 843.02. But, because neither is a felony offense, neither can provide the necessary predicate for a citizen's arrest. *See, e.g.*, *Sobrino*, 587 So. 2d at 1348 (finding that an officer's extra-jurisdictional stop could not be justified as a citizen's arrest because a "traffic infraction . . . in no way constituted a felony").[5]

---

[5]    Some Florida courts have held that "citizens have a 'right to arrest a person who commits a misdemeanor in their presence when said misdemeanor amounts to breach of the peace.'" *Roberts v. Dep't of Highway Safety & Motor Vehicles*, 976 So. 2d 1241, 1242 (Fla. 2d DCA 2008). For two reasons, these decisions do not render Mr. Rebalko's arrest lawful here.

    *First*, unlike in *Roberts*, which involved "erratic and unsafe driving," the Complaint contains no indication that Mr. Rebalko "breached the peace." *Second*, and in any event, the principle that an officer can arrest a person for a misdemeanor—outside of that officer's jurisdiction—does not apply to a misdemeanor *obstruction* charge. This is because Florida's courts have adopted the commonsense rule that a person may not be arrested for "resisting an officer" when the arresting individual is acting as a private citizen. *See, e.g.*, *Sinquefield v. State*, 1 So. 3d 370, 373 (Fla. 2d DCA 2009) (declining "to read section 843.02 to establish an offense of resisting a citizen's arrest").

*Fourth* (and finally), an officer may act outside his jurisdiction "when two enforcement agencies enter[] into a mutual aid agreement that permits the extraterritorial conduct by the outside police municipality." *Daniel v. State*, 20 So. 3d 1008, 1011 (Fla. 4th DCA 2009); *see also* FLA. STAT. § 23.127 ("Any employee of any Florida law enforcement agency who renders aid outside the employee's jurisdiction but inside this state pursuant to the written agreement entered under this part has the same powers, duties, rights, privileges, and immunities as if the employee was performing duties inside the employee's jurisdiction."). Here, however, the Rebalkos explicitly allege that Officer Coupe *falsely* claimed to have been deputized by the City of Parkland. Compl. ¶¶ 104–06. In any case, in their Motion to Dismiss, the Defendants never even suggest that they acted pursuant to some mutual-aid agreement. *See generally* Motion. They have thus waived any such argument (at least for the purposes of this Motion). *Cf. Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

Ultimately, then, the Complaint has plausibly alleged that the Officers acted outside their territorial jurisdiction—and, thus, without lawful authority. The inapplicability in these circumstances of qualified immunity—a doctrine that protects officers from suit when they act *within* their lawful discretion—should therefore be unsurprising. Indeed, in a case presenting similar facts, the Eleventh Circuit recently reached the same conclusion. *See Robinson v. Ash*, 805 F. App'x 634, 636–38 (11th Cir. 2020). There, a municipal officer investigated crimes that occurred outside his jurisdiction, obtained a search warrant for the suspect's phone, and—after seizing the phone—searched it. *Id.* at 637. The court affirmed the district court's denial of the officers' request for qualified immunity because the officer "present[ed] no evidence of any

criminal conduct by [the plaintiff] within [the officer's] jurisdiction"—and, as a result, the officer had "failed to show that he acted within the scope of his authority." *Id.* at 638. The same is true here. On the facts alleged, the Officers were not acting *within* their jurisdiction when they arrested Mr. Rebalko. If the Complaint's allegations are true, therefore, they exceeded their lawful authority and are not entitled to qualified immunity.

*Robinson*, notably, is no mere aberration. The Eleventh Circuit—and other courts within our Circuit—have consistently reached the same result. *See, e.g.*, *Jones v. City of Atlanta*, 192 F. App'x 894, 898 (11th Cir. 2006) (denying qualified immunity at summary judgment where the officers "ha[d] not proven that they were acting within the scope of their discretionary authority" since they "were outside of their police jurisdiction when they allegedly violated [the plaintiff's] constitutional rights"); *Ball v. City of Coral Gables*, 2007 WL 9706910, at *5 (S.D. Fla. Dec. 19, 2007) (denying qualified immunity at motion to dismiss where "[t]he Complaint state[d] that [the officers] were outside of their jurisdiction when they allegedly violated [the plaintiff's] constitutional rights").[6]

Against all this, the Defendants advance three arguments—all unavailing.

*First*, the Defendants challenge the Rebalkos' (factual) assertion that the Officers initiated their stop of the third-party vehicle *outside* their jurisdiction. In doing so, the Defendants ask the Court to review "judicially noticeable maps"—from Google Maps—which (they say) establish that the vehicle stop occurred "within the boundaries of the City of Coral Springs." Motion at 5–6. While maps are generally subject to judicial notice, *see, e.g.*, *United States v. Ibarguen Palacios*,

---

[6] N.B., after the *Ball* Court denied the officers' request for qualified immunity at the motion-to-dismiss stage, it granted them immunity at summary judgment—a decision the Eleventh Circuit affirmed. *See Ball v. City of Coral Gables*, 548 F. Supp. 2d 1364, 1371 (S.D. Fla.) (granting summary judgment after the officers submitted proof that their extra-jurisdictional actions were authorized by a mutual-aid agreement), *aff'd*, 301 F. App'x 865 (11th Cir. 2008).

815 F. App'x 481, 488 n.9 (11th Cir. 2020), a map—like all other judicially noticed facts—must not be "subject to reasonable dispute," *Kenny A. ex rel. Winn v. Perdue*, 547 F.3d 1319, 1327 (11th Cir. 2008) (quoting FED. R. EVID. 201(b)). Here, though, the Rebalkos have submitted an "official" map that—according to them—shows "an inter-municipal boundary line significantly south of the map line proffered by Defendants." Response at 5. Because the Google Map the Defendants have submitted is "subject to reasonable dispute," the Court declines to take judicial notice of it—at least at this (preliminary) phase of the case.[7]

*Second*, the Defendants rely on *Maughon v. City of Covington*, 505 F. App'x 818, 822 (11th Cir. 2013). In that case, the court afforded qualified immunity to an officer who arrested someone outside his jurisdiction because (1) the officer "was acting with the permission of his supervisor," (2) the officer effectuated the arrest "in collaboration with [the outside county]," (3) the officer secured the suspect "in the presence of a[n outside county] officer," and (4) the officer arrested the person "very close to the . . . county line." *Id.* That ruling is, for two reasons, inapposite here. *One*, most of the critical *Maughon* facts appear nowhere in the Complaint. So, for instance, there is no indication that the Officers arrested Mr. Rebalko with the permission of their supervisor, or in collaboration with the City of Parkland, or in the presence of any Parkland police officers. *Two*—and more fundamentally—*Maughon* was decided under Georgia law, which includes the following rule: "if a crime occurs on a boundary line between city and county, jurisdiction is proper in either venue." *Id.* (citing *Criddle v. State*, 712 S.E.2d 569, 571 (Ga. Ct. App. 2011)). But there

---

[7] In any case, even if this Court were to take notice of the Defendants' maps, those maps only indicate that *part* of the road on which the third-party vehicle was stopped—and on which Mr. Rebalko was arrested—falls within the City's jurisdictional limits. And, of course, the maps *do not* show that the segment of the road that falls within the City is where the events giving rise to this case occurred.

16

is no similar rule in Florida, where the events in this case occurred.[8] *Maughon*, then, does not control us here.

*Third*, the Defendants insist that this case is "actually identical" to *Parker v. State*, 362 So. 2d 1033, 1033 (Fla. 1st DCA 1978), where the First District Court of Appeal ("DCA") upheld an extra-jurisdictional arrest. In that case, though, the court simply held that, when officers are conducting a *lawful* investigation outside their jurisdiction, a person who obstructs that *lawful* investigation can be charged with (and convicted of) obstruction. *Id.* at 1033–34. But, as the Court has already noted, for any such investigation to be lawful, (1) the subject matter of the investigation must originate within the jurisdiction, and (2) the officers must rely only on their senses and the subject's voluntary cooperation—i.e., the tools any private citizen would have at his disposal. *See Sills*, 852 So. 2d at 393. In *Parker*, the court pointed out that the investigation concerned "the sale of stolen property within the city" and never suggested that the officers relied on "the color" of their office in questioning people outside their jurisdiction. *Parker*, 362 So. 2d at 1033–34. *Parker*, in short, is not at all "identical" to our case.

Ultimately, qualified immunity is an understandably expansive shield designed to afford officers immunity for actions they take on the job. But the shield's protections are not limitless. To deserve the immunity, officers must first show that they were acting within the scope of their authority—as that authority is defined by state law. When, as here, officers stray from their lawful jurisdiction and act without authority, they are treated like ordinary citizens—without the security blanket of qualified immunity. *See generally Estate of Cummings v. Davenport*, 906 F.3d 934, 940

---

[8] In *Jones*, for example, it was not enough that the alleged traffic infraction occurred *near* the municipal boundary. *See* 279 So. 3d at 345. Instead, as the Court explained, "[t]he dispositive question of [the officer's] authority to pursue Jones into unincorporated Orange County turns on whether Jones's failure to come to a complete stop at the red light at this intersection before turning right occurred within the boundaries of the city." *Id.*

(11th Cir. 2018) ("Although qualified immunity provides government officials with a formidable shield, their entitlement to raise that shield is not automatic. We have explained that the official bears the initial burden of raising the defense of qualified immunity by proving that he was acting within his authority . . . ."); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) ("When a government official goes completely outside the scope of his discretionary authority, he ceases to act as a government official and instead acts on his own behalf. Once a government official acts entirely on his own behalf, the policies underlying the doctrine of qualified immunity no longer support its application.").

The Officers' request for qualified immunity is, for all these reasons, denied.

### B.     Probable Cause

Because they have plausibly alleged that the Officers[9] arrested Mr. Rebalko without probable cause, the Rebalkos have properly asserted federal- and state-law claims for false arrest, false imprisonment, and malicious prosecution.[10] The Rebalkos levy two federal causes of action

---

[9] It's hard to imagine any viable claim here against Officer Perez. The Complaint, after all, makes clear that Officer Coupe—not Officer Perez—arrested Mr. Rebalko. Compl. ¶ 62. Indeed, the Complaint is pellucid that Officer Perez was off dealing with the third-party vehicle and its occupants throughout the entire course of Mr. Rebalko's interaction with Officer Perez. *Id*. ¶ 71. Had the Defendants raised this argument, then, the Court would have been inclined to dismiss this charge as against Officer Perez. But, for whatever reason, the Defendants never made this argument—either in the Motion or in the Reply. They have thus waived any such argument—at least until summary judgment. *Cf. Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed waived.").

[10] The Defendants have moved to dismiss these counts *solely* on the argument that there *was* probable cause. *See* Motion at 3. As a result, the Court assumes—without deciding—that the Rebalkos have satisfied the other elements of these causes of action.

against the Officers under 42 U.S.C. § 1983: false arrest[11] and malicious prosecution[12] (Counts I and IV). Both claims require the plaintiff to show an *absence* of probable cause. *See, e.g.*, *Carter v. City of Melbourne*, 731 F.3d 1161, 1170 (11th Cir. 2013) (the plaintiff's "false arrest . . . and malicious prosecution claims also fail because he has not presented any evidence that he was arrested without probable cause"); *Atterbury v. City of Miami Police Dep't*, 322 F. App'x 724, 729 (11th Cir. 2009) (the presence of "probable cause" precludes a plaintiff's "§ 1983 claims of false arrest . . . and malicious prosecution"). The Rebalkos also advance three (similar) state tort claims against the Officers: false arrest; false imprisonment;[13] and malicious prosecution (Counts XI, XII,

---

[11] Describing the elements of false arrest, the Eleventh Circuit has said that "[a] warrantless arrest ***without probable cause*** violates the Constitution and provides a basis for a section 1983 claim." *Bowens v. Superintendent of Miami S. Beach Police Dep't*, 557 F. App'x 857, 863 (11th Cir. 2014) (emphasis added) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004)).

[12] "To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures." *German v. Sosa*, 399 F. App'x 554, 558 (11th Cir. 2010) (quoting *Kingsland*, 382 F.3d at 1234). Under Florida law, a malicious prosecution claim has six elements:

> (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) ***there was an absence of probable cause for the original proceeding***; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding.

*Id.* (emphasis added) (quoting *Kingsland*, 382 F.3d at 1234); *see also Durkin v. Davis*, 814 So. 2d 1246, 1248 (Fla. 4th DCA 2002) (setting out the elements).

[13] Florida courts have generally viewed false-arrest and false-imprisonment claims as equivalent. *See, e.g.*, *Willingham v. City of Orlando*, 929 So. 2d 43, 49–50 (Fla. 5th DCA 2006) ("The cases seem to treat false imprisonment and false arrest as essentially the same tort when the issue involves an arrest and detention by a law enforcement officer."); *Weissman v. K-Mart Corp.*, 396 So. 2d 1164, 1165 n.1 (Fla. 3d DCA 1981) ("False arrest and false imprisonment are different labels for the same cause of action.").

To state a claim for "false arrest and false imprisonment, [a] plaintiff [is] required to show that [the] defendants, in procuring his arrest, exercised unlawful restraint and detained him against his will." *City of Hialeah v. Rehm*, 455 So. 2d 458, 461 (Fla. 3d DCA 1984). "The existence of probable cause constitutes an affirmative defense to the claims of false arrest and imprisonment

XIV, and XV). Each of these claims likewise requires an *absence* of probable cause. *See, e.g.*, *Williams v. City of Homestead*, 206 F. App'x 886, 889 (11th Cir. 2006) (noting that the court's "finding that [the officer] had probable cause" required the court to dismiss the plaintiff's Florida law claims for "false imprisonment, false arrest and malicious prosecution").

The standard for assessing probable cause is the same under both federal and Florida law. *See Davis v. City of Apopka*, 734 F. App'x 616, 621 (11th Cir. 2018) ("The probable cause standard is the same under Florida and federal law."). "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) (quoting *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002)). The probable cause standard "represents a necessary accommodation between the individual's right to liberty and the State's duty to control crime." *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975); *see also Wong Sun v. United States*, 371 U.S. 471, 479 (1963) (warning that "relaxation of the fundamental requirements of probable cause would 'leave law-abiding citizens at the mercy of the officers' whim or caprice'" (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949))).

"Whether an arresting officer possesses probable cause . . . naturally depends on the elements of the alleged crime and the operative fact pattern." *Skop*, 485 F.3d at 1137–38 (citation omitted); *see also Toole v. City of Atlanta*, 798 F. App'x 381, 386 (11th Cir. 2019) ("Our analysis of whether an officer had probable cause is based on the elements of the crimes alleged and the available facts."). Here, the Defendants proffer two crimes for which (they say) Mr. Rebalko could

---

under Florida law." *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998); *see also Miller v. City of Jacksonville*, 603 So. 2d 1310, 1312 (Fla. 1st DCA 1992) ("Probable cause is an affirmative defense to a claim of false arrest or false imprisonment . . . .").

have been arrested: a traffic violation under Florida Statutes § 316.1945; and obstruction under Florida Statutes § 843.02. But, taking (as the Court must) the Rebalkos' allegations as true, no reasonable officer could have thought Mr. Rebalko committed either of these offenses. The Court addresses each in turn.

### 1. Traffic Violation

Viewing the facts in the light most favorable to the Rebalkos, it would be unreasonable for any officer to conclude that Mr. Rebalko had violated § 316.1945. That section provides, in pertinent part, as follows: "Except when necessary to avoid conflict with other traffic . . . , no person shall . . . [s]tand or park a vehicle . . . [w]ithin 30 feet upon the approach to any . . . stop sign . . . ." FLA. STAT. § 316.1945(1)(b)(4). In this case, Mr. Rebalko was leaving his neighborhood via Godfrey Road (the community's only point of egress), when he approached a busy, four-lane highway during rush-hour traffic. Compl. ¶¶ 45, 53, 193. After coming to a break at the stop sign, he tried to turn out onto the highway. *Id.* ¶ 55. But his view was entirely blocked by a large (unmarked) police SUV that was obstructing the flow of traffic through the intersection. *Id.* ¶¶ 53– 54. According to the Complaint, Officer Coupe, standing nearby, watched Mr. Rebalko struggle to turn, offered no help, and (instead) "repeatedly direct[ed] Mr. Rebalko to turn into oncoming traffic." *Id.* ¶ 55. Indeed, if it wasn't clear by then that his stop was "necessary to avoid conflict with other traffic," Mr. Rebalko then asked Officer Coupe to halt oncoming traffic so that he could "safely pull out." *Id.* ¶ 57. It was only when Officer Coupe failed to respond to this request that Mr. Rebalko stepped out of his car in the hopes of securing the assistance he needed to cross. *Id.* ¶¶ 57, 61. On these facts—again, taken *together*[14] and in the light most favorable to the Plaintiffs—

---

[14] This is admittedly a very close call. But, in reaching this result on a *motion to dismiss*, the Court here emphasizes in particular the Rebalkos' claim that Officer Coupe *both* saw him struggle and heard him ask for assistance. *See* Compl. ¶¶ 55, 57. Again, the evidence may show that these

Mr. Rebalko stopped because it was "necessary to avoid conflict with other traffic," and so no reasonable officer could have concluded that he violated § 316.1945.

### 2.      Obstruction

The Officers' suggestion that, on the facts alleged, they had probable cause to arrest Mr. Rebalko for obstruction fares no better. Florida law provides, in relevant part, as follows: "Whoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor." FLA. STAT. § 843.02. "In other words, to support a conviction for obstruction without violence, the State must prove: (1) the officer was engaged in the lawful execution of a legal duty; and (2) the defendant's action, by his words, conduct, or a combination thereof, constituted obstruction or resistance of that lawful duty." *C.E.L. v. State*, 24 So. 3d 1181, 1185–86 (Fla. 2009). For the reasons set out below—assuming the verity of the Rebalkos' factual averments—neither element was satisfied, and no reasonable officer could have concluded otherwise.

*First*, if the Complaint's assertions are to be believed, the Officers were not "engaged in the lawful execution of a legal duty" when they arrested Mr. Rebalko. To determine whether the Officers were engaged in the lawful execution of their legal duties, the Court must "'examine the applicable legal standard' that 'governs the officer's actions'" and "then determine 'whether the officer complied with that legal standard at the point where the act of resistance occurred.'" *Jackson v. State*, 192 So. 3d 541, 542–43 (Fla. 4th DCA 2016) (quoting *C.E.L.*, 24 So. 3d at 1186). Put simply, a person cannot be held criminally liable for "obstructing" an officer's *unlawful* actions. *See Jay v. State*, 731 So. 2d 774, 775 (Fla. 4th DCA 1999) ("If an arrest is not lawful, then

---

allegations are untrue. But, *if* they are true—and without the benefit of any other facts to contradict them—then no reasonable officer could believe that Mr. Rebalko stopped for any reason other than "to avoid conflict with other traffic."

a defendant cannot be guilty of resisting it." (quoting *In re T.M.M.*, 560 So. 2d 805, 807 (Fla. 4th DCA 1990))).

Here, the Defendants' obstruction argument fails for the same reason as the Officers' misplaced claim to qualified immunity: The Officers—according to the allegations of the Complaint—were engaged in an *unlawful*, extra-jurisdictional search-and-seizure of a third-party vehicle when they arrested Mr. Rebalko. *See supra* Sec. I.A. A person cannot "obstruct" an unlawful, extra-jurisdictional investigation—and it would be unreasonable for any officer to conclude otherwise. *See, e.g.*, *Parker*, 362 So. 2d at 1034 (indicating that, unless an exception applies, an officer who is acting "outside his jurisdiction" is not "engaged in the lawful execution of a legal duty"). This fact alone disposes of any plausible obstruction charge.

The Second DCA's decision in *Sinquefield v. State* is directly on point. *See* 1 So. 3d at 371–72. There, an officer—who was outside his jurisdiction—observed the defendant breaking into a car. *Id.* at 371. When the officer confronted the defendant, the defendant "pushed the officer away and ran." *Id.* In reversing the defendant's conviction for obstructing an officer without violence under § 843.02 (the same provision at issue here), the court reasoned that "[t]he key in this case is the fact that the officer was outside his jurisdiction." *Id.* at 372. In other words, the officer "was not engaged in the lawful execution of any legal duty" when he confronted the defendant—and so, the defendant was free to resist him. *Id.* This same principle applies with equal force here. Because the Officers were outside their jurisdiction when they confronted and arrested Mr. Rebalko, they were not engaged in the lawful execution of any legal duty—and so, Mr. Rebalko could not be guilty of impeding (or obstructing) their investigation.[15]

---

[15] And it's no answer for the Officers to say that they had probable cause to arrest Mr. Rebalko because they *believed* that they were acting within their jurisdiction. Probable cause, after all, turns on objective realities—not subjective misunderstandings. *See Craig v. Singletary*, 127 F.3d 1030,

*Second*, even if the Officers *had* been pursuing a lawful duty, Mr. Rebalko's brief communication with the Officers—at least when the Complaint's allegations are viewed in the light most favorable to the Rebalkos—did not rise to the level of obstruction. "Florida courts have generally held, with very limited exceptions, that physical conduct must accompany offensive words to support a conviction under § 843.02." *Davis v. Williams*, 451 F.3d 759, 765 (11th Cir. 2006).[16] Those courts have explained that this limiting construction of the obstruction statute is "necessary to ensure that the offense as defined does not infringe upon rights of free speech under the First Amendment." *D.A.W. v. State*, 945 So. 2d 624, 626 (Fla. 2d DCA 2006); *see also Wilkerson v. State*, 556 So. 2d 453, 455 (Fla. 1st DCA 1990) (upholding § 843.02 by construing the provision as not "reaching protected free speech" and only "proscrib[ing] . . . acts or conduct that operate to *physically* oppose an officer in the performance of lawful duties" (emphasis added)).

Indeed, a person's refusal to leave the scene of a search or arrest—even while yelling, cursing, or criticizing—rises to the level of obstruction *only if* the person's "physical presence was obstructing or impeding [the officer] in the performance of his duty." *Wilkerson*, 556 So. 2d at 456; *see also D.A.W.*, 945 So. 2d at 627 (no obstruction where the defendant refused to leave the

---

1042 (11th Cir. 1997) ("Probable cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been."). In any event, taken together, the Rebalkos' allegations—especially the Officers' almost-immediate attempts to cover up the extra-jurisdictional aspects of the arrest—support a plausible inference that the Officers knew they were acting outside their jurisdiction.

[16] Setting out the three exceptions, the Second DCA noted: "If a police officer is not engaged in executing process on a person, is not legally detaining that person, or has not asked the person for assistance with an ongoing emergency that presents a serious threat of imminent harm to person or property, the person's words alone can rarely, if ever, rise to the level of an obstruction." *D.G. v. State*, 661 So. 2d 75, 76 (Fla. 2d DCA 1995). None of these exceptions applies here, though, because, when Mr. Rebalko approached the scene, the Officers were not executing process on Mr. Rebalko, legally detaining him, or asking him for assistance in an ongoing emergency. *Cf. D.A.W. v. State*, 945 So. 2d 624, 626 (Fla. 2d DCA 2006) (holding that it is not enough for the officers to be serving, detaining, or seeking assistance from *somebody*; for the exception to apply, they must be serving, detaining, or seeking assistance from *the person* they later arrested for obstructing).

scene, even though the defendant was "harassing" someone an officer was arresting, because the officer did not "fear[] for his own safety" and "was not forced to interrupt the arrest process to deal with public safety concerns or other issues arising from [the person's] conduct"); *J.G.D. v. State*, 724 So. 2d 711, 711 (Fla. 3d DCA 1999) (no obstruction where the defendant refused to leave the scene because—while "loud and profane"—his "protest of police actions" was "non-violent").[17]

In our case, Mr. Rebalko's actions—on the facts alleged—do not approach the level of (mis)conduct contemplated in § 843.02. Mr. Rebalko reached the intersection (the scene of the drug search) approximately one *hour* after the officers began their search, by which point the scene had been both secured and cleared of *any* viable threats. *See* Compl. ¶¶ 50–51. When Mr. Rebalko struggled to turn onto the highway, Officer Coupe—who had not been leading the search— directed Mr. Rebalko to turn into oncoming traffic. *Id.* ¶ 55. When Mr. Rebalko asked for help, Officer Coupe—in another indication of how little Mr. Rebalko interfered—did not even respond. *Id.* ¶ 57. Mr. Rebalko then alighted his car, hoping to talk to Officer Coupe and to inform him of the traffic hazard he was facing. *Id.* ¶ 61. But, within *seconds* of approaching the scene, Officer Coupe placed him under arrest. *Id.* ¶¶ 132–34. There is, notably, no indication that Officer Coupe was drawn away from *any* task. The same goes for Officer Perez. In fact, the Rebalkos *specifically* allege that Officer Perez "did nothing to intervene." *Id.* ¶ 71. No reasonable officer could conclude that a person has obstructed a search when that person approaches an entirely secured scene simply to ask a non-lead officer for help turning onto a busy highway.

In a case with strikingly similar facts, the Eleventh Circuit—applying Florida law—arrived

---

[17] *Compare H.A.P. v. State*, 834 So. 2d 237, 238–39 (Fla. 3d DCA 2002) (affirming obstruction determination because the defendant "refused to leave the nearby area where the SWAT team was attempting to execute a narcotics search warrant," stood in the line of (possible) fire, and caused the police to "delay[] the execution of the narcotics search warrant").

at the same conclusion. *See Davis*, 451 F.3d at 764–67. The plaintiff, Donovan Davis, had noticed flashing police lights outside his house. *Id.* at 763. Concerned that a family member may have been involved in an accident, Davis approached the scene. *Id.* As it turns out, the officer (as in our case) had stopped a vehicle. *Id.* As Davis got closer, an officer twice told him to leave. *Id.* Davis initially turned away. But (again, as in our case) he grew concerned about what he perceived as a traffic hazard: the officer was blocking the road, forcing cars towards an unlit lake. *Id.* When Davis returned to the scene to warn the officer, he was again told to leave. *Id.* At that point, Davis asked to speak with the officer's superior (and one of Davis's guests asked for the officer's badge number). *Id.* Rather than comply with either request, the officer arrested Davis. *Id.* On these facts, the Eleventh Circuit concluded that the officer "did not have even *arguable* probable cause to arrest him." *Id.* at 764 (emphasis added). The court reasoned that "[n]either an owner's simple inquiry as to why officers are present on his property nor a person's attempt to bring a dangerous situation to the officer's attention can be construed as obstruction of justice." *Id.* at 767. And that is exactly what happened here. As in *Davis*, Mr. Rebalko says that he was simply attempting to bring a dangerous situation to the Officers' attention. This "can[not] be construed as obstruction of justice." *Id.*

In another similar case, the Eleventh Circuit—this time applying Georgia law—reached the same result. *See Skop*, 485 F.3d at 1138–40. The plaintiff, Laura Skop, was driving home when she found her driveway blocked by a police car. *Id.* at 1133. The officer had blocked off the street where a tree had fallen, some 110 feet from Skop's driveway. *Id.* After honking and getting no response, Skop rolled down her window and tried to tell the officer that she needed to get into her driveway. *Id.* at 1134. When the officer ignored her, she alighted her car and went over to the officer's window. *Id.* Although the officer rolled down his window, he immediately began yelling

at Skop about the downed tree. *Id.* When Skop asked for the officer's name and badge number, he jumped out of his car, slammed his door, and arrested her for obstruction. *Id.* Again, the Eleventh Circuit concluded that the officer lacked even "arguable probable cause" to arrest Skop because:

> Simply put, helping a stranded motorist like Skop *was* one of Brown's official duties, and the argument that Brown was impeded in this duty because Skop asked Brown to pull his car one foot forward—a request politely made, without raised voice or threat, and in a situation where she was not distracting his attention from a threatening situation—is utterly devoid of merit. Indeed, the suggestion that a citizen asking an officer to assist her thereby provides him with probable cause or even arguable probable cause to arrest her is without foundation in our law. Skop's attempts to clarify her question to Brown were not actions that could even conceivably have provided Brown with any basis for an obstruction arrest.

*Id.* at 1138. That reasoning is dispositive here. The suggestion that Mr. Rebalko could have impeded a fully secured search by politely asking for help is similarly "without foundation in our law." *Id*. The Complaint, in short, plausibly alleges that the Officers lacked probable cause to arrest Mr. Rebalko for obstruction.[18]

### C.    Parting Thoughts

This ruling is quite narrow. Its conclusions, after all, turn primarily on the Rebalkos' allegation (which this Court must accept as true) that—from start to finish—the Officers acted outside their jurisdiction. It is this critical allegation that (essentially) ended the qualified-immunity analysis and prevented the Court from proceeding to the next step of that inquiry: whether the Officers had "arguable probable cause" to arrest Mr. Rebalko. *Skop*, 485 F.3d at 1137 (noting that, at step two of the qualified-immunity analysis, "even if we determine that the officer did not in fact have probable cause, we apply the standard of 'arguable probable cause'").

---

[18] The *Skop* Court noted that, "[h]ad the circumstances been different—for example, had [the officer] been located at a busy intersection where Skop's inquiry impeded the officer's ability to direct other cars—this analysis might be different." *Skop*, 485 F.3d at 1139. With added facts, this same nuance could alter the result here—either at summary judgment or at trial. But, at this stage, the Complaint never suggests that Mr. Rebalko's query *meaningfully* distracted the Officers from *any* other task.

This makes a difference. In the "arguable probable cause" inquiry, the question is only whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] *could have believed* that probable cause existed to arrest." *Id.* (quoting *Lee*, 284 F.3d at 1195). Perhaps even more importantly, "[a]rguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest." *Lee*, 284 F.3d at 1195 (quoting *Scarbrough v. Myles*, 245 F.3d 1299, 1302–03 (11th Cir. 2001)). On the Rebalkos' facts, the Defendants were not entitled to this analytical benefit. Instead, the Court evaluated whether the Officers had *actual* probable cause—a much higher standard.[19]

---

[19]      In their brief, the Rebalkos launch several additional arguments—beyond the ones the Court has already examined—for their assault on the Defendants' claim to qualified immunity. In anticipation of the parties' forthcoming summary-judgment briefing—and in the hopes of framing (if not narrowing) the issues—the Court here responds to some of those arguments.

     *First*, the Rebalkos appear to contend that the Officers were acting outside their lawful discretion because "Godfrey Road is a private road" where the Officers had no authority to enforce the traffic laws. *See* Response at 7. But this argument adds very little to the Rebalkos' position on the extra-jurisdiction-ness of the arrest. That is, if the Officers had authority to act beyond their jurisdiction, they likewise would have had authority to enforce the traffic laws on Godfrey Road. *Cf.* FLA. STAT. § 316.640(3)(a) (noting that, while officers generally have authority to enforce traffic laws only on (1) public roads and (2) private roads that have entered into agreements with the city, "nothing in this chapter shall affect any law, general, special, or otherwise, in effect on January 1, 1972, relating to 'hot pursuit' without the boundaries of the municipality"). Although the law on this issue is admittedly sparse, it would seem reasonable to presume that, if an officer can—under the guise of "hot pursuit"— detain or question a suspect beyond his jurisdiction, then (under that same guise) he should be able to arrest someone on a private road.

     *Second*, the Rebalkos suggest that, *even if* the Officers initiated their trail of the third-party vehicle within the City, their decision to search the vehicle outside their jurisdiction would still be unlawful. The Rebalkos have cited no authority for this argument—which, in any case, is contradicted by Florida law. *See, e.g.*, *Jones*, 279 So. 3d at 346 (indicating that, because the officers were in "fresh pursuit," both the extra-jurisdictional stop *and the subsequent search* were lawful); *Porter*, 765 So. 2d at 78 (noting that, because the "police officers were in fresh pursuit," they were "entitled to effectuate a valid arrest outside their jurisdiction" *and* to conduct "a valid search and seizure"); *Cheatem v. State*, 416 So. 2d 35, 36 (Fla. 4th DCA 1982) ("We also disagree with appellant's second contention that the [extra-jurisdictional] warrantless search that followed the stop was improper.").

     *Third*, the Rebalkos claim that the Officers lacked probable cause to search the third-party vehicle because the Officers only "detected the odor of past use of marijuana (i.e., the smell of burnt marijuana) coming from the car," and (they contend) past marijuana use is not a crime. *See*

***

Because the Officers are not entitled to qualified immunity—and because they arrested Mr. Rebalko without probable cause—the Defendants' Motion to Dismiss is **DENIED** with respect to the Rebalkos' federal- and state-law false-arrest, false-imprisonment, and malicious-prosecution claims (Counts I, IV, XI, XII, XIV, and XV).

## II.    Excessive Force and Battery (Counts III and XIII)

The Rebalkos' excessive-force and battery claims likewise survive.[20] "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197. The question is whether the "force used to effect a particular seizure is 'reasonable' under the Fourth

---

Response at 10. But the Eleventh Circuit has said that the odor of burnt marijuana may give an officer probable cause to believe that the suspect *currently* possesses marijuana. *See, e.g.*, *United States v. Cheeks*, 795 F. App'x 805, 811–12 (11th Cir. 2019) (finding probable cause based (in part) on the "odor of burnt marijuana," and noting that "[o]ur precedent makes clear that an officer's level of suspicion rises to the level of probable cause when he detects 'what he [knows] from his law enforcement experience to be the odor of marijuana'" (quoting *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991))); *United States v. Session*, 649 F. App'x 821, 822 (11th Cir. 2016) (finding probable cause where the officer "detected a strong odor of burnt marijuana and observed that the occupants of the vehicle were extremely nervous"); *United States v. Hamilton*, 299 F. App'x 878, 882 (11th Cir. 2008) (finding probable cause where the officers "smelled a strong odor of burnt marijuana as soon as [the suspect] rolled down his window").

*Fourth*, the Rebalkos argue that the "Defendants had no legal right to make a custodial arrest of Mr. Rebalko based on a traffic infraction," such as § 316.1945. Response at 7. The Rebalkos are wrong. Florida law expressly provides that "[a] law enforcement officer may arrest a person without a warrant when . . . [a] violation of chapter 316 has been committed in the presence of the officer." FLA. STAT. § 901.15(5); *see also United States v. Burrows*, 566 F. App'x 889, 892 (11th Cir. 2014) ("Florida law also authorizes a law enforcement officer to arrest a person who has violated § 316.1945 without a warrant.").

[20] The parties agree that, at least in our case, the excessive-force and battery claims rise and fall together. *See* Motion at 9–10; Response at 14. And this makes sense. *Cf. Detris v. Coats*, 523 F. App'x 612, 617 (11th Cir. 2013) ("We have already determined [the plaintiff's] excessive force claim should have been allowed to proceed, and we thus conclude the parallel state law claim of battery should also be allowed to proceed."); *City of Miami v. Sanders*, 672 So. 2d 46, 47 (3d DCA 1996) (holding that, "[i]f excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery").

Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also* U.S. CONST. amend. IV (affording protection "against unreasonable searches and seizures"). Courts generally rely on three nonexclusive factors in assessing the "reasonableness" of an officer's use of force: "(1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Stephens v. DeGiovanni*, 852 F.3d 1298, 1321 (11th Cir. 2017) (quoting *Graham*, 490 U.S. at 396).

Applying this standard, the Eleventh Circuit "has repeatedly found it clearly established under the Fourth Amendment 'that officers may not use excessive force against a non-resisting suspect who has already been subdued.'" *Cendan v. Trujillo*, 779 F. App'x 688, 690 (11th Cir. 2019) (quoting *Reese v. Herbert*, 527 F.3d 1253, 1274 n.33 (11th Cir. 2008)). Indeed, the Eleventh Circuit has made clear "that where a detainee is not resisting arrest, gratuitous use of force—even a single punch—is excessive." *Quinette v. Reed*, 805 F. App'x 696, 705 (11th Cir. 2020) (finding that a two-handed shove to a non-resisting detainee was excessive); *see also Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (a "single punch to the stomach" to a non-resisting detainee was excessive).

Here, according to the allegations of the Complaint, Mr. Rebalko was under control, not resisting, and obeying commands—that is, he was fully subdued—when Officer Coupe "roughly and painfully jerk[ed] and dragg[ed] him around by the handcuffs," and then "shoved" him to the ground for no reason. Compl. ¶ 67. On these facts, Officer Coupe's use of force was entirely unnecessary, gratuitous, and unreasonable. The three *Graham* factors only confirm this point: *First*, the "severity" of the crime at issue did not support the use of force. Mr. Rebalko, after all, is alleged only to have committed a traffic infraction and a non-violent misdemeanor. *Second*,

there is absolutely no indication that Mr. Rebalko posed an "immediate threat" to the Officers' safety. In fact, while on the scene, Officer Coupe even admitted to Mrs. Rebalko that "her husband had not been aggressive toward him in any way." *Id.* ¶ 75. *Third*, on our facts, Mr. Rebalko was neither resisting nor a flight risk. To the contrary, on the Rebalkos' account, Mr. Rebalko "fully complied with being handcuffed," "did not attempt to flee," and "did not physically resist the officers in any way." *Id.* ¶¶ 64–66. To jerk and drag and shove to the ground a sixty-year-old man in these circumstances is plainly "malicious[]," "sadistic[]," and unconstitutional. *See Skelly v. Okaloosa Cty. Bd. of Cty. Comm'rs*, 456 F. App'x 845, 848 (11th Cir. 2012).

In support of their contrary view, the Defendants advance two arguments—both meritless.

*First*, the Defendants argue that the Officers' use of force "is *de minimis* as a matter of law and is not actionable." Motion at 10. But the Eleventh Circuit has explicitly rejected this argument. *See Saunders v. Duke*, 766 F.3d 1262, 1267 (11th Cir. 2014). In *Saunders*, the officers (like the Defendants here) contended that the plaintiff's excessive-force claim should be dismissed because the officers' use of force was "*de minimis*." *Id.* at 1269. While recognizing that the application of *de minimis* force may (sometimes) bar an excessive-force claim, the court held that the *de minimis* force "principle has never been used to immunize officers who use excessive and gratuitous force after a suspect has been subdued, is not resisting, and poses no threat." *Id.* at 1269–70; *see also Hall v. McGhee*, 762 F. App'x 837, 844 (11th Cir. 2019) (rejecting the very argument the Defendants advance here and noting that "[t]he focus in an excessive force claim is on the nature of the force used rather than the extent of the injury"); *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010) (rejecting the notion "that the absence of 'some arbitrary quantity of injury' requires automatic dismissal of an excessive force claim"). According to the Rebalkos' allegations, Officer Coupe deployed excessive force "after [Mr. Rebalko] ha[d] been subdued, [wa]s not resisting, and pose[d]

no threat." The *de minimis* force doctrine thus does not apply here.[21]

      *Second*, the Defendants contend that the Rebalkos' excessive-force claim is "subsumed in the illegal stop or arrest claim." Motion at 9 (quoting *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000)). But, as the Eleventh Circuit made plain in the very case the Defendants rely on, an excessive-force claim will be subsumed into a false-arrest claim only "where a plaintiff contends the force was excessive because there was no basis for *any* force." *Jackson*, 206 F.3d at 1171; *see also Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1332 (11th Cir. 2006) ("[W]here an excessive force claim is predicated *solely* on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim." (emphasis added)). Here, though, the Rebalkos aver that, *even if* the arrest had been lawful, the "quantum of force" Officer Coupe used was not—and this is sufficient to state a separate claim. *See, e.g.*, *Alston v. Swarbrick*, 954 F.3d 1312, 1320 (11th Cir. 2020) (holding that an excessive-force claim was not subsumed into the false-arrest claim when the claim was "independent of whether law enforcement had the power to arrest" (quoting *Bashir*, 445 F.3d at 1332)); *Battiste v. Jenne*, 2006 WL 8432570, at *2 (S.D. Fla. Aug. 2, 2006) (same). In any event, the Rebalkos allege that it was only "[a]*fter* Mr. Rebalko was handcuffed" that Officer Coupe shoved him to the ground—thereby making clear that the complained-of force was entirely subsequent to (and separate from) the force the Officer used to effectuate the arrest. Compl. ¶ 67.

---

[21] In rejecting the notion that an officer is shielded from liability if he inflicts—only by chance—a *de minimis* injury on a non-resisting arrestee, the Eleventh Circuit has (in effect) rejected a doctrine of moral luck. *See* Thomas Nagel, *Moral Luck*, *in* MORAL LUCK 57, 58 (Daniel Statman ed., 1993) (recognizing that—at least before close examination—"it is intuitively plausible that people cannot be morally assessed for what is not their fault, or for what is due to factors beyond their control").

*** 

The Rebalkos, in sum, have plausibly alleged that Officer Coupe used excessive force on Mr. Rebalko. The Motion is therefore **DENIED** as to Counts III and XIII.

### III.    First Amendment Retaliation (Count II)

The Rebalkos' First Amendment Retaliation claim will also survive. "'As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Id.* (quoting *Hartman*, 547 U.S. at 259). Crucially, "[t]he plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Id.* at 1724.[22]

After Mr. Rebalko left his car to approach Officer Coupe, he introduced himself as an attorney and (according to the Complaint) mildly criticized the Officers' decision to leave their SUV in the middle of a busy intersection. Compl. ¶¶ 62, 133–34. Within seconds of Mr. Rebalko's introduction, Officer Coupe exclaimed: "Oh an attorney, hands behind your back." *Id.* ¶¶ 132, 134. This sequence of events—and, in particular, their close proximity to one another—is sufficient to raise a plausible inference that Officer Coupe retaliated against Mr. Rebalko *because of* his protected speech. Indeed, in their Motion, the Defendants never suggest otherwise. Instead, they argue only that Mr. Rebalko's First Amendment claim should be dismissed because they had

---

[22] In hinting at the one possible exception to the "no-probable-cause requirement," the Supreme Court explained that the requirement "should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 139 S. Ct. at 1727. There is no indication that this exception applies here.

probable cause to arrest him. But, having found that—taking the Complaint's allegations as true—the Officers lacked probable cause to arrest Mr. Rebalko, the Court denies this aspect of the Motion as well.

***

The Defendants' Motion to Dismiss the Rebalkos' First Amendment retaliation claim (Count II) is therefore **DENIED**.

### IV.     Failure to Intervene Against Officer Perez (Count V)

The Rebalkos, however, have failed to state a claim against Officer Perez for "failing to intervene" in the false arrest. *See* Compl. ¶¶ 71, 80, 153. The Eleventh Circuit has long recognized a duty to intervene in *excessive-force* cases. *See Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983."). "The law of this circuit is that 'an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'" *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007) (quoting *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002)). For the duty to apply, the officer must have a "reasonable opportunity" to intervene. *Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996).

But the Eleventh Circuit has taken a decidedly more circumscribed view with respect to an officer's duty to intervene *in a false arrest*. In the false-arrest context, unless the non-intervening officer "was part of the chain of command authorizing the arrest action," the Eleventh Circuit has held that "[m]erely being present with the arresting officers at the scene is not enough." *Brown v. City of Huntsville*, 608 F.3d 724, 737 (11th Cir. 2010). Instead, in addition to the requirements that

govern in excessive-force cases (most notably, the reasonable-opportunity-to-intervene requirement), the plaintiff must show that the non-arresting officer (1) "was present during an arrest," (2) "knew that the arresting officer had no reasonable basis for . . . probable cause," and (3) "was sufficiently involved in the arrest." *Wilkerson v. Seymour*, 736 F.3d 974, 979 (11th Cir. 2013). In other words, mere presence is not enough; a non-arresting officer must "kn[o]w the arrest lacked any constitutional basis and yet participate[]" in the arrest anyway. *Id.* at 980.

And this makes sense. While an officer's mere presence may justify an obligation to interfere in another officer's needless assault on a detainee, a plaintiff should be required to show something more before the law imposes a duty on officers to question their partners' arresting authority. This is so for (at least) two reasons. *First*, while it will often be obvious that an officer is deploying excessive force, an arresting officer will likely have far more information about probable cause than his partners—and that information may *not* be readily apparent to others.[23] *Second*, whereas a false arrest can be remedied in relatively short order by a probable cause hearing, the consequences of an officer's use of excessive force can be both irreparable and far more severe. As Judge Brasher, then sitting on the district court, explained:

> It is one thing to require a police officer to stop his partner from hitting someone with a baton. It is another to require that every officer on the street actively inquire as to the constitutional merits and predicate of each seizure by other officers, and then countermand seizures they believe are unreasonable. It would effectively conscript every police officer to play the role of internal affairs as well as

---

[23] *Cf. Lockhart v. Vest*, 2014 WL 3401454, at *11 (N.D. Ala. May 14, 2014) ("Whether an arrest is constitutional stands on a far different footing than whether the use of force to effect the arrest is constitutional. Merely by observing how force is used to make an arrest, a reasonable officer can judge whether it is unconstitutionally excessive and should be stopped. That is not true of an arrest. One officer making an arrest may have far more information establishing probable cause than nearby officers, so that it is unreasonable to impose [on] fellow officers the duty to second-guess the probable cause decisions made by an arresting officer. It is reasonable for fellow officers to defer to the arresting officer in the assessment of whether probable cause to make the arrest exists."), *report and recommendation adopted in part, rejected in part*, 2014 WL 3396236 (N.D. Ala. July 10, 2014).

peacekeeper.

*Stallworth v. Hurst*, 2019 WL 5070196, at *2 (M.D. Ala. Oct. 8, 2019).[24]

With this framework in mind, the Rebalkos have (for three reasons) failed to state a plausible claim against Officer Perez. *First*, there is no indication that Officer Perez had a "reasonable opportunity"—or, really, *any* opportunity—to intervene in Mr. Rebalko's arrest. Even according to the Rebalkos' account, Officer Perez was leading a drug search of a vehicle that was some distance away when Mr. Rebalko alighted his car, approached the scene, and (within "seconds") was arrested by Officer Coupe. Compl. ¶¶ 132, 150. On these facts, it would seem implausible to suggest that Officer Perez had any time to intervene. *Second*, the Complaint never even alleges that Officer Perez "knew the arrest lacked any constitutional basis." *Wilkerson*, 736 F.3d at 979. Indeed, the Complaint is entirely silent on the crucial question of whether Officer Perez even knew *why* Officer Coupe was arresting Mr. Rebalko. *Third*, the Complaint fails to aver that Officer Perez was "sufficiently involved" in the arrest to trigger some liability. On this point, the Rebalkos posit only that Officer Perez "stood by . . . but did nothing to intervene." Compl. ¶ 71. But, as we've established, Officer Perez's "mere presence" at the scene is simply insufficient to state a failure-to-intervene claim. *Brown*, 608 F.3d at 737.

This case also differs materially from other cases in which courts have found that an officer failed to intervene in an arrest. In *Stallworth*, for example, the Middle District of Alabama concluded that the plaintiff had plausibly alleged that the non-arresting officer knew the arrest was unconstitutional, that he had the opportunity to prevent it, and that he had been "sufficiently involved" in the arrest, because the non-arresting officer (1) heard the arresting officer's basis for

---

[24] These factors, after all, bear on whether certain conduct is "reasonable" under the Fourth Amendment—which, of course, is the font of these failure-to-intervene claims. *See Jones v. Fransen*, 857 F.3d 843, 853 (11th Cir. 2017) (linking failure-to-intervene claim with an individual's "Fourth Amendment right to be free from the use of excessive force").

arresting the suspect—the scent of alcohol and marijuana in the car; (2) "had the opportunity to determine for himself whether those statements were true or false"; and (3) helped place the suspect under arrest. *See Stallworth*, 2019 WL 5070196, at *3.

Our case is completely different. *First*, the Complaint never alleges that Officer Perez knew why Officer Coupe was arresting Mr. Rebalko. *Second*, even if Officer Perez did know, the Rebalkos specifically aver that the arrest took place within a "few seconds," Compl. ¶ 132—rendering implausible any presumption that Officer Perez (who was busy leading a separate drug search) had any opportunity to assess the constitutionality of (let alone stop) Mr. Rebalko's arrest. *Third*, the Complaint explicitly asserts that Officer Perez "did nothing": he did not, in other words, question Mr. Rebalko; arrest him; secure him; or assist in any way in his detention. Officer Perez, in sum, was not at all involved—let alone "sufficiently" so—in Mr. Rebalko's arrest.[25]

 Other decisions consistently embrace these same principles. *See, e.g.*, *Wilkerson*, 736 F.3d at 980 (11th Cir. 2013) (non-arresting officer did not sufficiently participate where he only arrived at the scene post-arrest and "rel[ied] on the account of the arrest provided by" the arresting officer); *Jones v. Cannon*, 174 F.3d 1271, 1286 (11th Cir. 1999) (non-arresting officer was "sufficiently involved" when the officer interrogated the suspect, supervised the suspect, and then brought the suspect to jail for booking—all based on a "confession" at the interrogation that the non-arresting officer knew never, in fact, occurred); *Goodwin v. Crawford Cty.*, 2020 WL 873920, at *13 (M.D. Ga. Feb. 21, 2020) (non-arresting officer was "sufficiently involved" in the arrest when he

---

[25] The closest the Rebalkos come to asserting some such involvement is their allegation that, "[o]ver several days," Officer Perez helped Officer Coupe draft the arrest reports, which (they say) misstated the situs of the arrest. Compl. ¶¶ 84–85. Even assuming that this post-hoc involvement would be sufficient to sustain a failure-to-intervene claim, the Complaint never suggests that Officer Perez drafted these reports—or that he ever learned about any inadequacy with the arrest—*before* Mr. Rebalko's next-day release from jail. And, of course, after Mr. Rebalko was released, Officer Perez could not have "intervened" in the arrest.

"participated in the arrest by restraining [the suspect] while he was pressed against the truck"); *Tarpley v. Miami-Dade Cty.*, 212 F. Supp. 3d 1273, 1285 (S.D. Fla. 2016) (non-arresting officer not liable for failure to intervene when the arrest "took fifteen seconds at most"—and so, the non-arresting officer "had no time to gather any facts concerning [the] arrest . . . to determine whether the officers had probable cause").

And, for three reasons, the Rebalkos' separate claim that Officer Perez failed to intervene in Mr. Rebalko's prosecution fares no better. *First*, the Rebalkos have pointed the Court to no authority for their view that an officer can be liable for failing to intervene in a *prosecution*. *See generally* Response. *Second*, even if such a claim were cognizable, it would be inappropriate here. The Rebalkos, after all, do not claim that Officer Perez's failure to act resulted in Mr. Rebalko's prosecution. Rather, it was (they insist) Officer Perez's affirmative malfeasance in drafting (what they say were) fraudulent reports that caused the State to prosecute Mr. Rebalko. *See* Compl. ¶¶ 84–86. And this is no meaningless distinction. The Rebalkos, after all, have charged Officer Perez in a separate count with malicious prosecution. *Id.* ¶¶ 149–158. *Third*, in their Response to the Motion to Dismiss, the Rebalkos defend only their claim that Officer Perez failed to intervene in the *arrest*. *See* Response at 16. By failing to respond to the Motion to Dismiss with respect to their separate claim that Officer Perez failed to intervene in the *prosecution*, the Rebalkos have waived any defense of that claim. *Cf. Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

*** 

Since the Rebalkos' failure-to-intervene claim against Officer Perez (Count V) does not

align with their factual allegations, the Motion to Dismiss is **GRANTED** as to that claim.

## V.      Equal Protection "Class of One" Claim (Count VI)

The Rebalkos' "class of one" claim finds no support in the Complaint. The Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. A "class of one" claim "does not allege discrimination against a protected class." *Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306–07 (11th Cir. 2009). Rather, a "class of one" claim avers that some individual was "irrationally singled out"—*without* regard for his or her membership in any group—for discrimination. *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008). The Eleventh Circuit has held that, "under a 'class of one' theory, a plaintiff must show that (1) he 'has been intentionally treated differently from others similarly situated,' and (2) 'there is no rational basis for the difference in treatment.'" *Watkins v. Cent. Broward Reg'l Park*, 799 F. App'x 659, 664 (11th Cir. 2020) (quoting *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1201 (11th Cir. 2007)).[26]

"Class of one equal protection claims generally require plaintiffs to identify comparators in the pleading in order to show intentional, discriminatory treatment different from others similarly situated." *Eisenberg v. City of Miami Beach*, 1 F. Supp. 3d 1327, 1340 (S.D. Fla. 2014) (Altonaga, J.); *see, e.g.*, *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1275 (11th Cir. 2008) (granting judgment on the pleadings as to a "class of one" claim because the plaintiff "did not sufficiently particularize a similarly situated comparator"); *Griffin Indus.*, 496 F.3d at 1208 (granting motion to dismiss a "class of one" claim because the plaintiff's "own complaint shows that it was not similarly situated to its purported comparator"). The Eleventh Circuit has applied

---

[26] *See generally Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (holding that a "class of one" claim is cognizable under the Equal Protection Clause).

this comparator requirement strictly, noting that, "[t]o be similarly situated, the comparators must be prima facie identical in all relevant respects." *Jordan v. Sec'y, Fla. Dep't of Children & Family Servs.*, 723 F. App'x 690, 693 (11th Cir. 2018).[27]

The Seventh Circuit—which has written extensively on the "class of one" doctrine—"has developed an exception to the traditional requirement that plaintiffs must identify comparators to state a claim." *Eisenberg*, 1 F. Supp. 3d at 1341. In that circuit's view, a plaintiff may not need to identify comparators "where disparate treatment 'is easily demonstrated but similarly situated individuals are difficult to find.'" *Brunson v. Murray*, 843 F.3d 698, 706 (7th Cir. 2016) (quoting *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013)). Under the Seventh Circuit's exception, then, "if the allegations signal that the plaintiff alone suffered the defendant's harassment, there is no need to identify a comparator." *Id.* at 707.

A couple of examples of the Seventh Circuit's application of its exception may help elucidate its contours. *See Swanson*, 719 F.3d at 785; *Geinosky v. City of Chicago*, 675 F.3d 743, 745 (7th Cir. 2012). In *Geinosky*, the plaintiff received—in a span of just fourteen months—twenty-four bogus parking tickets, all written by officers from a single police unit. *Geinosky*, 675 F.3d at 745. Some of the tickets were inconsistent—for instance, they sometimes showed that the plaintiff's car was in two places at once—and *all* of the tickets were ultimately dismissed. *Id.* On these facts, the Seventh Circuit held that the plaintiff didn't have to identify a comparator, because the facts "so clearly suggest[ed]" that the plaintiff was singled out for "harassment by public officials that ha[d] no conceivable legitimate purpose." *Id.* at 748.

Similarly, in *Swanson*, the plaintiffs, whose home abutted the mayor's, built a three-foot

---

[27] This makes sense. "Adjudging equality necessarily requires comparison, and 'class of one' plaintiffs may (just like other plaintiffs) fairly be required to show that their professed comparison is sufficiently apt." *Griffin Indus.*, 496 F.3d at 1205.

fence between their property and the mayor's. *See* 719 F.3d at 782. The mayor, displeased with

the fence, retaliated by repeatedly entering the plaintiffs' home without permission, using his

influence to block the plaintiffs from receiving permits, shouting at the plaintiffs at a meeting about

the permits, and directing the city to prosecute the plaintiffs for code violations. *Id*. The plaintiffs

also pointed to a neighbor who, though he had erected a (somewhat) similar fence, had endured

none of these troubles. *Id.* The Seventh Circuit found this unique set of (fairly egregious)

circumstances sufficient to state a "class of one" claim. In its view, "[i]t would be oddly formalistic

to . . . demand a near identical, one-to-one comparison" when this chain of harassment was a

"drastic deviation from th[e] norm," and where the mayor's statements "made clear that his

personal hatred caused this unwarranted difference in treatment." *Id.* at 785.

The Eleventh Circuit has not specifically addressed the Seventh Circuit's view that

comparators may be unnecessary (at the pleading stage) in certain unique factual scenarios, such

as when public officials invidiously target an individual for harassment. *See Eisenberg*, 1 F. Supp.

3d at 1341. But the Eleventh Circuit *has* repeatedly stressed that the comparator requirement is

crucial to avoid "subject[ing] nearly all state regulatory decisions to constitutional review in

federal court and deny[ing] state regulators the critical discretion they need to effectively perform

their duties." *Leib*, 558 F.3d at 1307 (quoting *Griffin Indus.*, 496 F.3d at 1203). Even the Seventh

Circuit has (in recent years) expressed concern that too "loose a standard [for 'class of one' actions]

could invite a flood of cases." *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 893 (7th Cir. 2012)

(Posner, J.).

For this reason, even after the Seventh Circuit's decisions in *Geinosky* and *Swanson*, the

Eleventh Circuit has consistently dismissed "class of one" claims when, as here, the complaint

identifies no comparator. *See, e.g.*, *Watkins*, 799 F. App'x at 664 (granting motion to dismiss

because the plaintiff "did not allege that the police had received complaints about any of his proffered comparators, so he failed to plead that anyone else was sufficiently similarly situated to state a class-of-one claim"); *Carruth v. Bentley*, 942 F.3d 1047, 1059 (11th Cir. 2019) (granting motion to dismiss because "a plaintiff must point to someone else who received or is receiving more favorable treatment"—and the plaintiff had failed to do this); *Jordan*, 723 F. App'x at 693 (granting motion to dismiss because the plaintiff "did not provide sufficient facts about comparators to show that they were similarly situated and that he was treated differently from them").

These principles compel only one conclusion: the Rebalkos have failed to allege a "class of one" claim here.

*First*, in their Complaint, the Rebalkos did not identify even a *single* comparator who received more favorable treatment. *See generally* Compl. They did not allege, for example, that some other individual who had approached these (or any other) Officers in the way that Mr. Rebalko did was *not* arrested. Nor have they suggested that these Officers gave assistance to other drivers who (like Mr. Rebalko) asked them for help with crossing a busy intersection. *Id.* The Rebalkos, in other words, have not shown that Mr. Rebalko was treated differently than anyone else. And, in our Circuit, this failure is fatal to their claim.

*Second*, even under the Seventh Circuit's broader test, the Rebalkos' claim would fail because the Complaint never says that Mr. Rebalko was singled out for *invidious* harassment. Although the Rebalkos claim that "an ongoing course of contentious interactions between these parties over the City's contended misuse of Godfrey Road . . . ultimately culminated in Mr. Rebalko's vindictive arrest and prosecution," *id.* ¶ 165, the Complaint never suggests that the Officers had any idea about this (purported) feud when they arrested him. To the contrary, by the

Rebalkos' own account, the SAO prosecuted Mr. Rebalko, not because it harbored some acrimony towards him, but because the Officers duped it into levying (falsified) criminal charges. *Id.* ¶¶ 84– 86, 104–05. In other words, there is no indication that *any* actor—neither the SAO nor the Officers—vindictively targeted Mr. Rebalko.

And, while the Rebalkos allude to a long history of acrimony with the City, they identify *no* instance in which the City *ever* singled them out for mistreatment in the past. As a result, their claim that the City was somehow able to manipulate this chance encounter—a chance encounter that Mr. Rebalko, not the City, initiated—to target Mr. Rebalko for arrest and prosecution is (almost frivolously) implausible. *See Iqbal*, 556 U.S. at 683 (quoting *Twombly*, 550 U.S. at 570); *see, e.g.*, *Hill v. Rubald*, 2017 WL 201357, at *8 (N.D. Ill. Jan. 18, 2017) ("Here, there was a single traffic stop and ensuing prosecution, which by themselves do not demonstrate a readily obvious animus. Plaintiff fails to show any pattern or campaign of harassment, so the Court will enter summary judgment in favor of defendants . . . .").[28] The Rebalkos, in short, have articulated the most charitable possible construction of a test the Eleventh Circuit has never adopted; and, even under this (most) permissive reading of an as-yet inapplicable test, they lose.

---

[28] The Rebalkos try to draw a distinction between "class of one" claims that result from "*arbitrary* government action" and those that stem from "*vindictive* acts of government." Response at 17. They do this in an (apparent) attempt to bypass the comparator requirement. *See id.* (arguing that *only* the arbitrary-treatment cases require the plaintiff to show "adverse government treatment compared to a set of materially similar individuals"). But there are two problems with this argument. *First*, the Seventh Circuit is sharply split on what precisely a "class of one" claim requires, and no segment of that split draws so clean a division between "arbitrary" and "vindictive" class-of-one claims. *See Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 913 (7th Cir. 2012) (en banc) (offering, in three separate opinions, three different "class of one" tests). *Second*—and in any event—the Rebalkos have simply failed to demonstrate that the Officers arrested Mr. Rebalko (or that the SAO prosecuted him) *because of* some preexisting animus. Their claim thus fails any of the Seventh Circuit's various tests.

\*\*\*

Because the Rebalkos have failed to show that Mr. Rebalko was treated differently than any other person—or that he was vindictively singled out for harassment—the Defendants' Motion to Dismiss the equal protection "class of one" claim (Count VI) is **GRANTED**.

### VI.     *Monell* **Municipal-Liability Claims (Counts VII and VIII)**

The Rebalkos similarly fail to state a claim against the City for insufficient training or supervision. A city "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, "a plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997). The Supreme Court has held that, in "limited circumstances," a municipality may be liable for failing to train or supervise its employees. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). These circumstances arise when a city's "employees cause a constitutional injury as a result of the municipality's policy- or custom-based failure to adequately train or supervise its employees." *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1188 (11th Cir. 2011).

Although a city "rarely will have an express written or oral policy [or custom] of inadequately training or supervising its employees," *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998), the Supreme Court has said that a city may be liable for having implemented such a policy or custom when its failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact," *Canton*, 489 U.S. at 388. "To establish . . . such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350.

"Establishing notice of a need to train or supervise is difficult." *AFL-CIO*, 637 F.3d at 1189. "A city may be put on notice in two ways." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009). *First*, "[a] pattern of similar constitutional violations by untrained [or unsupervised] employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train [or supervise]." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bryan Cty.*, 520 U.S. at 409). In such cases, the city's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Bryan Cty.*, 520 U.S. at 407.

*Second*, as an alternative means of demonstrating deliberate indifference, the Supreme Court has "simply hypothesized" about the possibility that a plaintiff might succeed in a failure-to-train-or-supervise claim "in a narrow range of circumstances" where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* at 409. In cases where "the need for more or different training is so obvious, . . . the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. As its only example of this "obvious" need, the Court suggested that municipalities that provide their officers with firearms might be liable under *Monell* if they then failed to afford those officers *any* training on the use of deadly force—a highly specific (and unlikely) scenario. *Id*. So unlikely, in fact, that neither the Supreme Court nor the Eleventh Circuit has "[]ever determined that the need for 'more or different' training was obvious." *Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 942 (11th Cir. 2017).

The Complaint fails under either test. The Rebalkos, after all, have offered neither a pattern of similar constitutional violations nor a glaringly "obvious" gap in the City's training or

45

supervision. *First*, on the question of pattern, the Rebalkos have pointed *solely* to the Defendants' actions against Mr. Rebalko *in this case*. That is, they have identified *no other* instance in which any City officer acted beyond his or her extra-jurisdictional authority, arrested a suspect without probable cause, or deployed excessive force against a detainee. Nor have the Rebalkos pointed to any citizen complaints about similar constitutional violations. This case, then, is a far cry from the situation in which "the employees of the municipality[,] 'in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers.'" *Denham*, 675 F. App'x at 942 (quoting *Canton*, 489 U.S. at 390 n.10); *see also Gold*, 151 F.3d at 1349 (finding insufficient evidence of a pattern of false arrests for disorderly conduct even where the plaintiff provided evidence that, over a five-year period, about 1,301 of 8,201 disorderly-conduct arrests were dismissed or *nolle prossed*); *Brooks v. Scheib*, 813 F.2d 1191 (11th Cir. 1987) (concluding that the city lacked notice of past police misconduct even where the plaintiff showed that ten different citizens had (in the past) filed complaints about the defendant-officer).

Hoping to parry this conclusion, the Rebalkos claim that the Defendants' actions against Mr. Rebalko—standing alone—are enough to establish the kind of pattern that should have put the City on notice of deficiencies in their training and supervision. *See* Response at 18. In support, they point to the following "series" of acts:

> (a) a pretextual traffic stop without probable cause support, segueing to an unlawful extended drug search lacking probable cause, (b) the officers' creation of an extended dangerous traffic hazard leading to the unlawful and dangerous order given to Mr. Rebalko, (c) the presence of officers taking actions without regard for jurisdiction, (d) unsupervised officers engaging in activities unrelated to their assigned dedicated detail (retail theft at a local Target), (e) no ADA training provided to either officer, (f) officers fabricating evidence to support their unlawful arrest to submit to the SAO, and (g) the municipal culture needed to allow Coupe the boldness to hold himself out as having deputy status to salvage a case that would not have been filed but for Coupe's fabrications.

*Id.* But this smorgasbord of variegated constitutional and statutory violations—which straddles provisions as disparate as the Fourth Amendment and the ADA—cannot form a string of "prior *similar* constitutional violations [which would] put the City on notice of its need to train officers." *Vielma v. Gruler*, 808 F. App'x 872, 882 (11th Cir. 2020) (emphasis added); *Carter v. Columbus Consol. Gov't*, 559 F. App'x 880, 881 (11th Cir. 2014) (no pattern of constitutional violations where past complaints against an officer were "unrelated" and "not connected" to the plaintiff's false-arrest claim); *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (no pattern of excessive force where the plaintiff could not "show that any [prior instances] involved factual situations that are substantially similar to the case at hand").

*Second*, on the issue of "obviousness," this is not the (extremely) rare case in which a deficiency in training or supervision is "so obvious" that the City could be said to have been deliberately indifferent to the need for more or different guidance. While it may be "obvious" that police officers need *some* training on the topics the Rebalkos complain about—i.e., traffic enforcement, probable cause determinations, the contours of a *Terry* stop, jurisdictional constraints, and the First Amendment—the Complaint alleges only that the Officers received *insufficient* training, and not (as *Canton* hypothesized) *no* training at all. *See* Compl. ¶¶ 184, 187, 189, 190, 194, 200.[29] As the Fifth Circuit has said, the "so obvious" path "is generally reserved for

---

[29] The Rebalkos do allege that the City provided the Officers with "no ADA training." Compl. ¶ 201. But this is not a glaring omission. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1329 n.21 (11th Cir. 2015) (rejecting contention that the need to train officers on the use of deadly force against "people with mental illnesses" was so obvious); *Lewis*, 561 F.3d at 1293 (rejecting failure-to-train claim where the subject of the alleged failure to train did "not have the same potential flagrant risk of constitutional violations as the use of deadly firearms"). In any case, the Rebalkos cannot premise their failure-to-train-or-supervise claim on the ADA because, as set out below, the Rebalkos have not plausibly alleged any ADA claim. *See Best v. Cobb Cty.*, 239 F. App'x 501, 504 (11th Cir. 2007) (a plaintiff's "'failure to train' claim could not exist independent of an underlying constitutional [or statutory] violation").

those cases in which the government actor was provided *no training whatsoever*"—something the Rebalkos elected not to allege. *Pena v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018) (emphasis added).[30] Even so, the Rebalkos fail to explain *how* or *why* the City's training was insufficient—an omission that renders their failure-to-train claim conclusory and, in material respects, implausible.

Perhaps recognizing these deficiencies, the Rebalkos lob one last Hail Mary: This case, they contend, falls within *Canton*'s "so obvious" exception because (according to them) cars are like guns, and the Supreme Court has suggested that the need to train armed officers on the use of deadly force *may be* obvious. *See* Response at 19 (arguing that "[c]ars *and* guns are classified by the law as dangerous instrumentalities"). But "[t]he obvious need for specific legal training that was present in the *Canton* scenario"—police officers are unlikely to be familiar with the (constantly evolving) constitutional constraints on the use of deadly force—"is absent here." *Connick*, 563 U.S. at 64. In particular, unlike guns, cars are most often used towards non-violent ends—like driving to the grocery store. And so, while it may be that—as with training on the deadly use of guns—cities should train officers on (for instance) how to operate a car safely *during a high-speed chase*, the Rebalkos' claims have nothing to do with those more dangerous aspects of driving. In fact, their claims—the unlawful arrest, the excessive force, the ADA violation, the malicious prosecution, and the infringements on Mr. Rebalkos' First and Fourteenth Amendment rights—have nothing to do with cars at all. At best, those (alleged) violations are only derivative of the Officers' decision to stop a third-party car and then to park their own SUV in the middle of

---

[30] Even if read to allege *no* training, the Rebalkos have not pointed the Court to *any* decision sustaining a failure to train claim in similar circumstances. And this makes sense. None of the alleged gaps in the City's training approach the egregiousness of the "how to use deadly force" hypothetical set out by the Supreme Court.

a busy intersection. But police officers don't need training on the dangers of parking their cars in the middle of busy streets because those dangers are, even without training, obvious to any sixteen-year-old with a driver's license. *See Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 490 (11th Cir. 1997) ("Where the proper response . . . is obvious to all without training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise." (quoting *Walker v. City of New York*, 974 F.2d 293, 299–300 (2nd Cir. 1992))). The Rebalkos' Hail Mary, in sum, falls far short.

***

The City was never put on notice of any need to provide more or different training or supervision—and so, it could not have been indifferent to any such need. As a result, the City's Motion to Dismiss Counts VII and VIII is **GRANTED**.

## VII.   The ADA Claims (Counts IX and X)

The Rebalkos' Americans with Disabilities Act ("ADA") claims fail as a matter of law. "Under Title II of the ADA, public entities are prohibited from discriminating against individuals with disabilities or denying them services because of their disabilities." *Owens v. Sec'y, Fla. Dep't of Corr.*, 602 F. App'x 475, 477 (11th Cir. 2015). Title II provides, in relevant part, as follows:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Based on this text, the Eleventh Circuit has held that, to state a viable Title II claim, a plaintiff must prove: "(1) that he is a qualified individual with a disability; and (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability."

*Owens*, 602 F. App'x at 477 (quoting *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)).[31]

Like most circuits, the Eleventh Circuit has held that an arrestee may premise an ADA claim against a public entity on the conduct of the arresting officers. *See Bircoll*, 480 F.3d at 1085 (applying the ADA to a DUI arrest); *see also Rylee v. Chapman*, 316 F. App'x 901, 905 (11th Cir. 2009) (applying the ADA to a detainee's "arrest, booking, and first appearance"); *Young v. Miami-Dade Cty.*, 2020 WL 2110012, at *6 (S.D. Fla. Apr. 21, 2020) ("[T]he County contends individual law enforcement encounters do not give rise to ADA liability . . . . The Court disagrees."); *see generally Gray v. Cummings*, 917 F.3d 1, 16 (1st Cir. 2019) (citing *Bircoll*, along with decisions from other circuits, as "holding that Title II applies without exception to ad hoc police encounters").[32]

---

[31] The Defendants do not contest (at least at this stage) that Mr. Rebalko is a "qualified individual with a disability" under step one. The City is also clearly a "public entity" under step two. *See* 42 U.S.C. § 12131(1) (noting that the term "public entity" includes "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government").

[32] The Defendants argue that the ADA does not apply to Mr. Rebalko's encounter with the Officers. *See* Motion at 18. In support of this view, they cite a Fifth Circuit case—admittedly an outlier—for the proposition that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents . . . , prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000). The City's argument is, for two reasons, unpersuasive.

*First*, the Fifth Circuit's decision in *Hainze* has been heavily criticized—even from within that circuit. *See, e.g.*, *Wilson v. City of Southlake*, 936 F.3d 326, 333 (5th Cir. 2019) (Ho, J., concurring) (noting that the court in *Hainze* "created a categorical 'exigent circumstances' defense that appears nowhere in the text of either the Americans with Disabilities Act or the Rehabilitation Act"—and so, "it is not surprising that every circuit to opine on this issue has to our knowledge rejected our approach").

*Second*—and more importantly—the Eleventh Circuit has already rejected the "exigent circumstances exception" to the ADA, reasoning that "exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance." *Bircoll*, 480 F.3d at 1085.

Although the Eleventh Circuit has not provided much guidance on the sorts of theories that may support an arrestee's ADA-discrimination claim, it has recognized that an arrestee may proceed with claims based either on "disparate treatment" or on a "failure to make reasonable accommodations." *Rylee*, 316 F. App'x at 906. The Rebalkos suggest that Mr. Rebalko was subjected to discrimination in the following two ways: (1) when Officer Coupe refused to help him turn onto the highway (which happened *before* Mr. Rebalko told the Officers about his disability); and (2) when Officer Coupe refused to unarrest Mr. Rebalko (which happened *after* Mr. Rebalko told him about the disability). *See* Response at 19. Neither circumstance, however, can sustain Mr. Rebalko's disparate-treatment and failure-to-accommodate claims.

We start with disparate treatment. In general, to prevail on a disparate-treatment (or intentional-discrimination) claim, a plaintiff must show that, "because of [his] disabilities . . . , [he] 'has actually been treated differently than similarly situated non-handicapped people.'" *Quality of Life, Corp. v. City of Margate*, 805 F. App'x 762, 767 (11th Cir. 2020) (discussing disparate treatment in the housing context); *see also Nadler v. Harvey*, 2007 WL 2404705, at *4 (11th Cir. Aug. 24, 2007) (stating, in the employment context, that "[d]isparate treatment involves discriminatory animus or intent and occurs when a disabled individual is treated differently than a non-disabled or less disabled individual because of his disability"). This simple test finds support in the language of Title II, which provides that (1) no person shall be "excluded from" or "denied" certain "benefits," or otherwise "subjected to discrimination," (2) "by reason of such disability." 42 U.S.C. § 12132; *cf.* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69 (2012) ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation.").

Even when the Complaint's allegations are viewed in the light most favorable to the

Rebalkos, their disparate-treatment claim fails for two reasons. *First*, the Complaint never suggests that Mr. Rebalko was "treated differently than similarly situated non-handicapped people." *Quality of Life*, 805 F. App'x at 767. It never says, for instance, that Officer Coupe has a long history of helping non-disabled folks cross busy streets in like circumstances. Nor does it aver that Officer Coupe routinely lets off non-disabled detainees with a simple "notice to appear," rather than an arrest. This lacuna is fatal to Mr. Rebalko's ADA claim. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1216 (11th Cir. 2008) (concluding, in the housing context, that a plaintiff had "no disparate treatment claim" because the plaintiff "utterly failed to establish that it was treated differently than anyone else").

*Second*, the Complaint never alleges that Officer Coupe refused either to help Mr. Rebalko or else to unarrest him "*by reason of [his] disability*." 42 U.S.C. § 12132. In fact, it's undisputed that, when Mr. Rebalko first asked for help (while he was still in his car), Officer Coupe had no idea that Mr. Rebalko had any disability. And, even once Mr. Rebalko was handcuffed—after Mr. Rebalko told him about his disability—there is no reason to think that Officer Coupe's decision to proceed with the arrest had anything to do with Mr. Rebalko's disability. The Rebalkos' theory of this case, after all, was that his arrest was "[s]parked," not by his disability, but by Mr. Rebalko's criticism of the Officers and "the single word 'attorney.'" Response at 1.[33]

---

[33] The closest the Rebalkos get to showing that Mr. Rebalko's arrest had anything to do with disability is their allegation that, (1) at the scene, Officer Coupe didn't believe Mr. Rebalko's claim that he was disabled, and that, (2) in their depositions, the Officers insinuated that people with disabilities, like Mr. Rebalko, should not drive. *See* Compl. ¶¶ 251–53. But, even together, these allegations are simply insufficient to raise a plausible inference that the Officers arrested Mr. Rebalko *because of* his disability. Notably, the Eleventh Circuit has rejected similar claims. *See, e.g.*, *His House Recovery Residence, Inc. v. Cobb Cty.*, 806 F. App'x 780, 783–85 (11th Cir. 2020) (denying disparate-treatment claim even where the county commissioner suggested that those with disabilities are dangerous); *Quality of Life*, 805 F. App'x at 768 (denying disparate-treatment claim even where the mayor likened those with disabilities to "sexual predator[s]").

The Rebalkos' failure-to-accommodate claim fares no better. In the regulations it promulgated to implement Title II, the Department of Justice said the following about a public entity's obligation to make reasonable modifications:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7)(i). By these terms, then, the ADA "does not require a public entity to employ any and all means to make . . . services accessible to persons with disabilities." *Bircoll*, 480 F.3d at 1082. Instead, the ADA requires only "reasonable modifications"—that is, those "that would not fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Id.* Even then, however, the duty to accommodate is triggered only if the modification is "necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i).

One more point. The Eleventh Circuit has held that a defendant "cannot be liable for refusing to grant a reasonable and necessary accommodation if [it] never knew the accommodation was in fact necessary." *Schwarz*, 544 F.3d at 1219 (quoting *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1275 (10th Cir. 2001)). "[T]his means that the defendant must know or reasonably be expected to know of the existence of both the handicap and the necessity of the accommodation." *Hawn v. Shoreline Towers Phase 1 Condo. Ass'n, Inc.*, 347 F. App'x 464, 467 (11th Cir. 2009); *see also Rylee*, 316 F. App'x at 906 ("In cases alleging a failure to make reasonable accommodations, the defendant's duty to provide a reasonable accommodation is not triggered until the plaintiff makes a 'specific demand' for an accommodation.").

Under this standard, the Officers did not deny Mr. Rebalko any reasonable accommodation here. *First*, with respect to Officer Coupe's failure to provide traffic assistance, even assuming the

reasonableness of Mr. Rebalko's request that an officer stop all traffic on a busy highway so that he (personally) could pull out of his private road, there is absolutely no indication that Officer Coupe had any reason to expect that Mr. Rebalko was disabled. Officer Coupe cannot be faulted for failing to accommodate a disability he didn't know about. *Cf. Rylee*, 316 F. App'x at 906 (rejecting a failure-to-accommodate claim where the arrestee "presented no evidence from which one could infer that the deputies knew or believed that" the arrestee was disabled).

*Second*, turning to Officer Coupe's refusal to unarrest Mr. Rebalko, that request was—in this Court's estimation—not "reasonable." To begin with, it would be unduly burdensome to require the City to release any arrestee who claims to suffer from *some* disability—however far-fetched or unproven. More fundamentally, any such unarrest requirement would work a fundamental alteration of the activity at hand: the arrest. In this respect, Mr. Rebalko's demand to be unarrested (and given a mere "notice to appear") is a lot like a wheelchair-bound employee who asks his employer—as an "accommodation"—to hand him a weekly cash stipend, rather than a ramp. It would be one thing, in other words, for a deaf arrestee to request an interpreter who might help him communicate with the Officers during his arrest—or for a quadriplegic detainee to ask for a wheelchair that might help him navigate the trip to jail. It is quite another to demand release altogether. This the ADA simply doesn't require. *See, e.g.*, *Siskos v. Sec'y, Dep't of Corr.*, 817 F. App'x 760, 765 (11th Cir. 2020) ("Requiring [the Florida Department of Corrections] to release [the plaintiff] into the custody of a residential treatment facility . . . would 'fundamentally alter the nature' of FDOC's imprisonment services.").

\*\*\*

Put simply, the Rebalkos' ADA claims fail because (1) as to the request for traffic assistance, Officer Coupe had no way of knowing about Mr. Rebalko's disability when Mr.

Rebalko sought his assistance—and so, he could not have discriminated against him *by reason of* that disability; and (2) as to the claimed entitlement to unarrest, people with disabilities are not immune from arrest. The Motion to Dismiss is therefore **GRANTED** as to the Rebalkos' ADA claims (Counts IX and X).[34]

### VIII.   The Trespass Claims (Counts XVI, XVII, XVIII, and XIX)

On the other hand, the Rebalkos have asserted a plausible claim for civil trespass. "Under Florida law, 'trespass to real property is an injury to or use of the land of another by one having no right or authority.'" *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1254 n.1 (11th Cir. 2006) (quoting *Guin v. City of Riviera Beach*, 388 So. 2d 604, 606 (Fla. 4th DCA 1980)). To recover for a trespass to real property, "the aggrieved party must have had an ownership or possessory interest in the property at the time of the trespass." *Winselmann v. Reynolds*, 690 So. 2d 1325, 1327 (Fla. 3d DCA 1997). "Even if no actual damages are proven, the plaintiff is still entitled to nominal damages and costs." *Daniel v. Morris*, 181 So. 3d 1195, 1199 (Fla. 5th DCA 2015).

Consent—even "implied consent by custom and usage"—is generally a defense to trespass. *Fla. Pub. Co. v. Fletcher*, 340 So. 2d 914, 918 (Fla. 1976). Consent "implied from custom, usage, or conduct is 'necessarily limited, however, to those acts that are within a fair and reasonable interpretation of the terms of the grant.'" *Crowell v. Fla. Power Corp.*, 438 So. 2d 958, 959 (Fla. 2d DCA 1983) (quoting *Boston Mfrs. Mut. Ins. Co. v. Fornalski*, 234 So. 2d 386 (Fla. 4th DCA), *cert. denied*, 238 So. 2d 476 (Fla.1970)).

"However, law enforcement personnel have a right, under appropriate circumstances, to enter upon private property," notwithstanding general trespass principles. *Feliciano v. City of*

---

[34] The Rebalkos have already abandoned Count X. *See* Response at 19 ("Plaintiffs concede Mrs. Rebalko's associated person claim.").

*Miami Beach*, 847 F. Supp. 2d 1359, 1368 (S.D. Fla. 2012). In particular, Florida courts have held

that, "[w]hen the lawful performance of his duty requires that an officer enter upon private property

to make a general inquiry, such an entry is justifiable." *State v. Garcia*, 374 So. 2d 601, 603 (Fla.

3d DCA 1979). Moreover, "in emergency situations the police may lawfully enter upon private

property without first obtaining a warrant." *Guin*, 388 So. 2d at 606. In such circumstances, a

trespass claim cannot survive. *Id.*

In our case, however, the Rebalkos have set out a plausible trespass claim. *First*, the

Complaint specifically alleges that the Officers—while conducting a search of the third-party

vehicle—*encroached* on Godfrey Road, a private road that runs through the Rebalkos' Parkland

neighborhood. *See* Compl. ¶¶ 29–30. *Second*, the Rebalkos *own* a share of Godfrey Road. *Id.* ¶

26.[35] *Third*, the Rebalkos (and their co-owners) did not *consent*—explicitly or otherwise—to the

Officers' use of the road. *Id.* ¶ 324. Indeed, the Rebalkos had expressly warned the City *not* to use

the road and even went so far as to ask the City to "cease [its] trespassing activities and operations."

*Id.* At the top of Godfrey Road are also "two large and prominent signs displaying the road's status

as a private road." *Id.* ¶ 320. And, even if the Rebalkos (or their neighbors) had impliedly consented

to the Officers' use of the road, it would be quite unreasonable for the Officers to view this consent

as encompassing the right to (dangerously) obstruct the road's only egress. *Id.* ¶ 45. *Fourth*, as

discussed, the Rebalkos have plausibly alleged that the Officers were *not* "lawfully performing

their duties" when they stopped on Godfrey Road—mainly because, in so doing, the Officers had

strayed beyond their territorial jurisdiction without any authority to do so. *See supra* Sec. I. On

---

[35] *See, e.g.*, *Grogan v. Heritage NH, LLC*, 2007 WL 9702573, at *3 (S.D. Fla. July 31, 2007) (finding that the plaintiff had stated a claim for trespass of a parking space at her apartment).

these facts, then, the Rebalkos have set out a plausible trespass claim.[36]

***

Because the Officers encroached on the Rebalkos' private road without their consent, the

Motion to Dismiss Counts XVI, XVII, XVIII, and XIX is **DENIED**.

### IX.     The Invasion-of-Privacy Claims (Counts XX, XXI, XXII, and XXIII)

The Officers cannot be liable for invasion of privacy, though, simply for stopping at the

intersection of a private road and a (busy) public highway. Florida courts have recognized four

categories of invasion of privacy:

> (1) Intrusion, i.e., invading plaintiffs' physical solitude or seclusion; (2) Public
> Disclosure of Private Facts; (3) False Light in the Public Eye, i.e., a privacy theory
> analogous to the law of defamation; and (4) Appropriation, i.e., commercial
> exploitation of the property value of one's name.

*Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 161 (Fla. 2003). Here, the Rebalkos proceed only

under the first category: intrusion. *See* Response at 20–21.

In a recent case, this Court had occasion to elaborate on the contours of Florida's intrusion

tort. *See Hall v. Sargeant*, 2019 WL 1359485, at *7 (S.D. Fla. Mar. 26, 2019) (Altman, J.). As the

Court there explained, the tort of invasion of privacy by intrusion requires "physically or

electronically intruding into one's private quarters." *Id.* (quoting *Allstate Ins. Co.*, 863 So. 2d at

162). "An intrusion claim has three elements. First, there must be a private quarter. Second, there

must be some physical or electronic intrusion into that private quarter. Third, the intrusion must

be highly offensive to a reasonable person." *Celestine v. Capital One*, 2017 WL 2838185, at *3

---

[36] The Defendants argue that the Rebalkos failed to state a trespass claim because they didn't have
"any reasonable expectation of privacy on the road." Motion at 18–19. But a "reasonable
expectation of privacy" is not an element of civil trespass. While an expectation of privacy may
be an element of a Fourth Amendment claim, "[t]he law of trespass forbids intrusions onto land
that the Fourth Amendment would not proscribe." *United States v. Hall*, 47 F.3d 1091, 1095–96
(11th Cir. 1995).

(S.D. Fla. June 30, 2017) (quoting *Stasiak v. Kingswood Co-op, Inc.*, 2012 WL 527537, at *1 (M.D. Fla. Feb. 17, 2012)). The Rebalkos' claim fails on the first and third elements.

 *First*, the Officers did not invade the Rebalkos' "private quarters." Although a person's home plainly constitutes a "private quarter[]," Florida's courts have said precious little about what else might qualify. *Guin*, 388 So. 2d at 606 (noting that a person may intrude on another's privacy by "invading his home" (quoting W. PROSSER, TORTS § 117 at 807 (4th ed. 1971))). Nonetheless, the Florida Supreme Court has explained that invasion of privacy by intrusion "is a tort in which the focus is the right of a private person to be free from public gaze," *Allstate Ins. Co.*, 863 So. 2d at 162—suggesting, at the very least, that the "quarters" in question must generally be shielded from public view. By this metric, an intersection on a busy public highway doesn't seem to qualify.

 The Eleventh Circuit's ruling in *Spilfogel v. Fox Broadcasting Co.*, 433 F. App'x 724 (11th Cir. 2011), supports this view. In that case, the plaintiff brought an invasion-of-privacy-by-intrusion claim after she was filmed during a traffic stop for an episode of the television show "COPS." *Id.* at 725. Applying Florida law, the Eleventh Circuit rejected her argument that "her conversation with the police officer in a public street amounted to an intrusion into her 'private quarters,'" reasoning that she had "voluntarily placed herself in a public place where she did not have a reasonable expectation of privacy." *Id.* at 727. It is but a small leap to conclude that a police officer's stop at the intersection of a public street—in full view of dozens of motorists and other passersby—fails for the same reason. And the Rebalkos have pointed the court to *no* authority that would suggest otherwise.

 *Second*, even assuming that the busy public intersection in question was (somehow) a "private" place, the intrusion in this case would not be "highly offensive to a reasonable person." On this prong, a plaintiff must plausibly allege that the intrusion "is so outrageous in character,

and so extreme in degree, as to go beyond all possible bounds of decency." *Watts v. City of Hollywood*, 146 F. Supp. 3d 1254, 1268 (S.D. Fla. 2015) (quoting *Stoddard v. Wohlfahrt*, 573 So. 2d 1060, 1062 (Fla. 5th DCA 1991)). A person's "subjective reaction" has no bearing on this analysis. *Id.* Rather, the plaintiff must demonstrate "as objectively as is possible, that the alleged misconduct is 'atrocious, and utterly intolerable in a civilized community.'" *Id.* (cleaned up) (quoting *Stoddard*, 573 So. 2d at 1062). This is an "onerous standard," and the Rebalkos have done nothing to satisfy it. *See* Compl. ¶¶ 351–390. Nor could they. Their claim, after all, turns on the (almost-hyperbolic) proposition that the Officers' decision to park their SUV at the intersection between a private and public road was so "objectively . . . atrocious" as to deserve the opprobrium of a "civilized community." *Watts*, 146 F. Supp. 3d at 1268 (quoting *Stoddard*, 573 So. 2d at 1062). However annoying the parked SUV may have been, it comes nowhere near meeting this standard.

***

Because the Rebalkos cannot state a claim for invasion of privacy on a very busy public highway, the Motion to Dismiss is **GRANTED** as to Counts XX, XXI, XXII, and XXIII.

## X.     The Loss-of-Consortium Claims (Counts XXIV, XXV, XXVI, and XXVII)

We are left, then, with the Rebalkos' loss of consortium claims—which will remain. The parties agree on the law. "While a spouse's loss of consortium claim is a separate and distinct cause of action against a defendant, it is also a derivative cause of action which cannot exist without a primary cause of action by the injured spouse against the same defendant." *Horst v. Parker*, 2007 WL 4234616, at *3 (M.D. Fla. 2007) (citing *Gates v. Foley*, 247 So. 2d 40, 45 (Fla. 1971)). Some of the underlying tort claims have survived—and, as a result, so do the loss-of-consortium claims.

***

The Motion to Dismiss is therefore **DENIED** as to the Rebalkos' loss-of-consortium claims

(Counts XXIV, XXV, XXVI, and XXVII).

## CONCLUSION

The Court dismisses Counts V through X and XX through XXIII with prejudice. Rule 15 of the Federal Rules of Civil Procedure allows a party to amend a pleading once as a matter of course. *See* FED. R. CIV. P. 15(a)(1). After that, a party may amend its pleading "only with the opposing party's written consent or leave of the court." FED. R. CIV. P. 15(a)(2). While the Court "should freely give leave when justice so requires," *id.*, it need not do so if (1) "there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed"; (2) "allowing amendment would cause undue prejudice to the opposing party"; or (3) "amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001).

For three reasons, the Court dismisses these ten counts *with* prejudice. *First*, despite having received leave to amend their initial Complaint, *see* Order [ECF No. 47], the Rebalkos failed to cure the many deficiencies the Defendants' initial Motion to Dismiss [ECF No. 33] identified there—deficiencies this Court touched upon in a hearing on that first Motion to Dismiss, *see generally* August 23, 2019 Hr'g Tr. [ECF No. 48]. *Second*, as this Order makes clear, any future amendment of these counts would be futile. *Third*, allowing the Rebalkos to amend at this *very* late stage in the case—long after discovery has been completed and on the eve of the filing of dispositive motions—would cause extreme and undue prejudice to the Defendants.

* * *

After careful review, the Court hereby

**ORDERS AND ADJUDGES** that the Defendants' Motion to Dismiss [ECF No. 52] is **GRANTED IN PART and DENIED IN PART** as set out in this Order.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 3rd day of November 2020.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record